**ESTATE of Hugh Gordon MILLER, Deceased, Allen Gordon Miller, Edwin Schroff and Helen T. Ives, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**ESTATE of Edna Allen MILLER, Deceased, Allen Gordon Miller and Erwin Schroff, Respondents.**

**Nos. 16940, 17133.**

United States Court of Appeals Third Circuit.

Argued June 20, 1968.

Decided Aug. 7, 1968.

James E. Bennet, Jr., Bennet & Ives, New York City, for petitioner in 16940 and respondent in 17133 (Est. of Miller and others).

Howard J. Feldman, Dept. of Justice, Tax Division, Washington, D. C., for petitioner in 17133 and respondent in 16940.

Before KALODNER and VAN DUSEN, Circuit Judges, and WRIGHT, District Judge

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

These appeals are from two decisions of the Tax Court, Estate of Edna Allen Miller, 48 T.C. 251 (1967), and Estate of Hugh Gordon Miller, 48 T.C. 265 (1967), decided as companion cases June 12, 1967. In both cases, the executors of the decedents' estates (hereinafter "taxpayers," "Hugh," or "Edna") resisted a deficiency determination made by the Internal Revenue Service ("I.R.S.") on the basis of the disallowance of certain charitable deductions claimed under § 2055 of the Internal Revenue Code of 1954 (26 U.S.C. § 2055).[1] In No. 16940 the taxpayer (Hugh) appeals from a decision for the Commissioner; in No. 17133 the Commissioner appeals from a decision for the taxpayer (Edna). Since these two appeals involve interpretation of the same section of the Tax Code, § 2055, and since they arise from the same underlying facts, they have been consolidated for argument and decision.

Stipulated facts were filed in both cases and can be summarized for purposes of these appeals as follows:

Edna Miller, wife of Hugh Miller, died February 10, 1960.[2] She was survived by Hugh and a son, Allen. In her will, paragraph Seventh (a), she provided that her residuary estate be held in trust; that the trust corpus be divided into two shares, one equal to forty percent. thereof, the other sixty percent.; that the net income of the 40% share was to go to Hugh for his life; and that Hugh had the power to appoint by will the 40% share "to or in favor of his estate * * * or to any person or persons."[3] If Hugh died without exercising this power of appointment, the income from the 40% share went to her son, Allen, for life, with the principal at his death going to "The Edna Allen Miller Foundation," a charitable corporation recognized by the I.R.S. as a qualified, exempt organization.[4]

---

1. All sections cited are from the 1954 Internal Revenue Code (26 U.S.C.).

2. A resident of Monmouth County, New Jersey, her will was admitted to probate in the Monmouth County Surrogate's Court and her executors filed her Federal Estate Tax Return on May 5, 1961.

3. The full terms of this part of her will are quoted in the Tax Court opinion, 48 T.C. at 253–254.

4. As defined in 26 U.S.C. § 2055(a) (2).

On December 6, 1960, Hugh executed an affidavit complying with the directions of § 2055(b) (2) (C) of the Code,[5] in which he averred that he was 84 years old at Edna's death and that he declared his intent to exercise in his will the power of appointment given in Edna's will by appointing the income of the 40% share to their son, Allen, for life, with the principal (remainder) to the Edna Allen Miller Foundation.[6] This affidavit was filed as part of Edna's Federal Estate Tax Return. On August 1, 1962, Hugh died, exercising the power of appointment in his will in the manner specified in his earlier affidavit.[7]

Edna's estate tax return claimed a marital deduction of $443,567.05 [8] under § 2056 (the value of the corpus of the "forty per cent share" trust, plus per-

5. The portions of § 2055 relevant to this decision are:

"§ 2055. Transfers for public, charitable, and religious uses.

"(a) In general.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate the amount of all bequests, legacies, devises, or transfers (including the interest which falls into any such bequest, legacy, devise, or transfer as a result of an irrevocable disclaimer of a bequest, legacy, devise, transfer, or power, if the disclaimer is made before the date prescribed for the filing of the estate tax return)—[to a list of organizations]

\* \* \* \* \*

"For purposes of this subsection, the complete termination before the date prescribed for the filing of the estate tax return of a power to consume, invade, or appropriate property for the benefit of an individual before such power has been exercised by reason of the death of such individual or for any other reason shall be considered and deemed to be an irrevocable disclaimer with the same full force and effect as though he had filed such irrevocable disclaimer.

"(b) Powers of appointment.—

"(1) General rule.—Property includible in the decedent's gross estate under section 2041 (relating to powers of appointment) received by a donee described in this section shall, for purposes of this section, be considered a bequest of such decedent.

"(2) Special rule for certain bequests subject to power of appointment.—For purposes of this section, in the case of a bequest in trust, if the surviving spouse of the decedent is entitled for life to all of the net income from the trust and such surviving spouse has a power of appointment over the corpus of such trust exercisable by will in favor of, among others, organizations described in subsection (a) (2), such bequest in trust, reduced by the value of the life estate, shall, to the extent such power is exercised in favor of such organizations, be deemed a transfer to such organizations by the decedent if—

"(A) no part of the corpus of such trust is distributed to a beneficiary during the life of the surviving spouse;

"(B) such surviving spouse was over 80 years of age at the date of the decedent's death;

"(C) such surviving spouse by affidavit executed within one year after the death of the decedent specifies the organizations described in subsection (a) (2) in favor of which he intends to exercise the power of appointment and indicates the amount or proportion each such organization is to receive; and

"(D) the power of appointment is exercised in favor of such organizations and in the amounts or proportions specified in the affidavit required under subparagraph (C).

"The affidavit referred to in subparagraph (C) shall be attached to the estate tax return of the decedent and shall constitute a sufficient basis for the allowance of the deduction under this paragraph in the first instance subject to a later disallowance of the deduction if the conditions herein specified are not complied with."

6. The full affidavit is quoted in the Tax Court opinion, 48 T.C. at 254–255 and 267. Hugh thus declared an intent to exercise the power in a manner exactly the same as Edna's gift over in default of exercise.

7. Hugh's will, signed July 31, 1961, was also admitted to probate in the Monmouth County, N. J. Surrogate's Court on October 30, 1962, and his executors filed his Federal Estate Tax Return November 1, 1963.

8. All values given for items on the returns of Edna and Hugh were agreed to by the parties before the Tax Court decision.

sonal effects left to Hugh valued at less than $2000.) and a charitable deduction of $229,761.00 under § 2055, the value of the remainder interest in the trust.

Hugh's estate tax return included in his gross estate the trust assets (valued at $445,883.49) over which he had a general testamentary power of appointment as defined in § 2041, and claimed a charitable deduction of $246,627.08 under § 2055 for the value of the remainder interest Hugh appointed to the charitable foundation.

The Tax Court held that Edna's estate was entitled to both the marital deduction under § 2056 and the charitable deduction under § 2055(b)(2). The Commissioner has appealed that decision (No. 17133). The Tax Court then held that Hugh's estate must include, pursuant to § 2041, the assets received from Edna over which he had a general testamentary power of appointment, but that he was not entitled under § 2055(b)(1) to any deduction for the remainder appointed to charity. The taxpayers have appealed that decision (No. 16940).

The decisions of the Tax Court attempted to decide the proper application of § 2055(b)(2) as related to the taxation of these two estates and as the subsection might affect the proper application of the other subsections of § 2055, and of §§ 2056 and 2041. Neither counsel for the parties nor the courts have been able to discover a prior decision dealing with § 2055(b)(2) or any other decisions sufficiently related to the problem posed to provide authoritative guidance. The two opinions of the Tax Court were thorough, carefully prepared, and attempted to track the difficult path between application of the Tax Code as literally written and application according to Congressional intent.

Briefly summarized, in Edna's estate (48 T.C. 251) the Tax Court found no justification in the Tax Code or Con-

gressional comments for ignoring the literal failure of § 2055(b)(2) to have any stated effect on § 2056 and, consequently, saw no basis for denying a full marital deduction for the value of the trust corpus, as well as an additional charitable deduction for the value of the remainder. In Hugh's estate, however (48 T.C. 265), they rejected a "literal" argument of the taxpayer on the grounds that the "literal" wording of § 2055(b) showed that a taxpayer's choice to proceed under the "special rule" of subsection 2055(b)(2) precluded any application of the "general rule" of subsection 2055(b)(1). Consequently, Hugh's claimed deduction under § 2055(b)(1) would be denied despite the necessary inclusion of the trust corpus in his gross estate under § 2041.

For the reasons stated below, we think that the courts have no choice in this case other than to apply subsection 2055(b)(2) literally as it is worded. As the Tax Court so aptly stated, "we are not aware of any authority which would give us the power to rewrite by judicial fiat an unambiguous statute in order to clear up ambiguities in its legislative history," 48 T.C. at 260. Aside from following the plain wording of the 1956 amendments to § 2055(b), no other principle of statutory construction can properly be employed in this case.[9] We lack sufficiently reliable information of legislative intent, in addition to the printed statute, to use even the most common of interpretative aids. For instance, the possibly attractive principle that a literal interpretation should not be followed if it leads to absurd results,[10] cannot be used to support the Government's contentions in this case, when there is no information from any source showing the purpose of subsection 2055(b)(2), showing its intended interrelationship with the rest of the estate tax sections or showing that it can be analyzed for any of the familiar touch-

---

9. See, for instance, the possibilities suggested in such construction statutes as the Pennsylvania Statutory Construction Act, 46 P.S. §§ 551–566.

10. E. g. Haggar Co. v. Helvering, 308 U. S. 389, 394, 60 S.Ct. 337, 84 L.Ed. 340 (1940).

stones of interpretation such as evil remedied, object sought, etc. The line of cases cited by the Commission descending from Charles Ilfeld Co. v. Hernandez, 292 U.S. 62, 68, 54 S.Ct. 596, 78 L.Ed. 1127 (1934), and allegedly supporting the rule of tax interpretation that double deductions are not permitted absent express statutory mandate, is merely a variation on the "avoid absurd results" rule. In addition, this tax "rule" has rarely been applied outside the peculiar income tax[11] context of consolidated corporate income tax reporting and attempted double deductions of business losses, and it cannot be regarded as a legitimate canon of estate tax interpretation[12] to assist the court in this case.

■ Applying such a literal interpretation to this case, we agree with the Tax Court in Edna's estate that so many problems are left unsolved and so many solutions are possible for remedying what might be considered the absurd result of the multiple deductions resulting from a literal reading of § 2055(b) (2) that no court should attempt to write what Congress unfortunately omitted[13] or invent the perhap more rational system that the Commissioner asks the court to supply.[14] And it is equally evident that

11. See, e. g., Missouri Pacific Railroad Company v. United States, 337 F.2d 637, 640, 167 Ct.Cl. 725 (1964), where the principle was labeled a "fundamental principle of income tax" and applied in the context of consolidated corporate returns and the problem of pre-issue interest deductions in a railroad reorganization.

12. The "rule against double deductions" seems particularly unuseful in the present case since, with respect to one "doubling," we are presented with separate taxpayers seeking deductions and since we observe that Congress has acted explicitly on one occasion to prevent double deductions arising in an estate tax context. See § 642(g) with reference to §§ 2053 and 2054. In addition, using broad equitable consideration, such as preventing multiple deductions, to solve problems raised by a tax statute is a dangerous course, e. g., Budd Company v. United States, 252 F.2d 456, 458 (3rd Cir. 1957). This applies to the Commissioner's observation that his position of a marital deduction for Edna and a charitable deduction for Hugh will produce a lower total tax bill than that resulting from the Tax Court's conclusion. This ironic wrinkle in this case may simply result from the fact that a wealthier husband survived his wife.

13. For instance, the Commissioner argues that Congress could only have intended (1) a special or limited power of appointment, making the trust nondeductible under § 2056 (additional situations are easily imaginable, however, which even the Commissioner's "remedy" does not repair, such as a power of appointment to a class excluding the decedent and his estate, but including the creditors of his estate, and thus falling within § 2041 but outside § 2056(b) (5)); (2) a second implied condition that a deduction could result only when one could not be obtained by disclaiming a power of appointment and securing the deduction because a gift over in default gave the remainder to a charity [under § 2055(a)] (this is just one aspect, however, of the general failure to deal with the "tax art" concept of disclaimer, see note 14 below, and other possible trust terms such as a power of invasion, which normally prevents a charitable deduction [see Treas.Regs. § 20.-2055–2(b) (1958)], are unmentioned in the statute); and (3) a third implied condition for § 2055(b) (2), namely, that it applies when a marital deduction trust exceeds the 50% limitation of § 2056(c), and § 2055(b) (2) could then properly retrieve any "wasted" portion of the trust up to the value of the remainder (this argument is a good example of the myriad acceptable legislative schemes that might be proper, depending upon factors that Congress apparently did not consider in the 1956 amendments).

14. The failure to link the affidavit of requirement (C)—regardless of the affidavit's wording—to the estate tax concept of "disclaimer" may be the most conspicuous omission. Such an affidavit as Hugh signed is not a "disclaimer" as that word is used rather uniformly in §§ 2055(a), 2056(d), 2041(a) (2). See, e. g., Seubert v. Shaughnessy, 233 F.2d 134 (2nd Cir. 1956). The I.R.S. contended that the affidavit made the trust a terminable interest under § 2056(b)—see 48 T.C. at 261–262—but this argument was correctly rejected, particularly in light of the settled concept of disclaimers—see Treas. Regs. §§ 20.2041–3(d) (6); 20.2055–2(c); 20.2056(d)–1(a)—and the principle that events at the time of decedent's death control.

the cryptic legislative report accompanying passage of the 1956 amendments[15] raises even more possible "solutions" to the "absurd result" of literally applying the badly drafted subsection.[16] For instance, the single example in the Senate Report of the 80-year-old spouse with a short life expectancy, plus the known favored position of charities throughout our Tax Code, may indicate that Congress fully intended double charitable deductions in its 1956 amendment. A great many other practical and legislatively justifiable tax results come to mind, and the statutory patterns for achieving them. This or any other court should consequently hesitate to select the single appropriate statutory scheme, particularly when such factors as the age requirement suggest that the "loophole" left open may be used by a very few taxpayers before Congress acts to close it if such is the legislative decision.

■ We disagree, however, with the Tax Court in Hugh's estate that the literal reading of the statute prevents any deduction under subsection 2055(b) (1). Hugh's deduction fell within the plain language as a deductible "bequest" and, as the Tax Court recognized, the trust corpus was fully taxable under § 2041. In order to reach a different result, the Tax Court in effect ignored the fact that § 2055(b) (1) and (b) (2) refer to deductions for two separate decedents,[17] and then relied on the phrases "general rule," "special rule," and "for purposes of this section" to impute a Congressional intent to deny any double charitable deduction. While such a statutory interpretation may be said to avoid a possibly "absurd result," we can

---

15. S.Rep.No. 2798, 84th Cong., 2d Sess., U.S.Code Cong. & Ad.News, p. 4456 (1956). The relevant portions of this brief report stated:

"The purpose of this bill is to allow a deduction for estate-tax purposes in the case of certain bequests in trust with respect to which no deduction is presently allowable. * * *

* * * * *

"Under present law, a deduction is allowed for estate-tax purposes for the amount of a bequest to a corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, * * *. This deduction also is allowed if an interest passes to such an organization by reason of a disclaimer made before the date prescribed for the filing of the estate-tax return. In some instances, however, it is not feasible for a legatee to allow a bequest to pass to charity by disclaiming it. For example, in the case of a bequest in trust where the income is payable to the surviving spouse of the decedent for life and the remainder to whomever the surviving spouse may appoint, the holder of the power of appointment could allow the property to pass to charity by disclaiming the power only if a charitable organization was named as the taker in default. This would be the result even if the donee is over 80 years old and has a relatively short life expectancy."

The only relevant part of the Congressional Record, 102 Cong.Rec. 14,295 (1956), adds nothing to this Report.

16. One experienced commentator has described § 2055(b) (2) as a "crassly conceived and crudely drawn statute [which] leaves many unsettled questions for the few taxpayers to whom it may apply." 4 Rabkin and Johnson, Federal Income, Gift and Estate Taxation, § 59.08(10) (1968). The commentators also seem to suspect strongly that the reason for inadequacies is that the section was a "private relief measure" and that, particularly in view of its retroactive character, it must be regarded as "special legislation." 4 Rabkin and Johnson, ibid; 4 Mertens, Law of Federal Gift and Estate Taxation, § 28.06, n. 17 (1959); Rudnick and Gray, Bounty Twice Blessed: Tax Consequences of Gifts of Property to or in Trust for Charity, 16 Tax L.Rev. 273, 304, n. 120 (1960).

17. While consideration of a combined husband-wife tax bill may play a key role in estate planning, Treasury analysis of proposed estate tax legislation, or a pedagogical approach to the Tax Code, this court is not aware of such an "equitable" analysis being a proper canon of construction of estate tax provisions, particularly in light of the fact that complete "consolidation" does not occur throughout the estate and gift tax sections and that Congress explicitly calls for such consideration when necessary. See, e. g., § 2040.

find no greater support for so deviating from the plain meaning of the statute than was present in Edna's estate and no greater assurance either that Congress did not intend a double deduction or that a double deduction was intended but only in a few specific instances.[18]

The two decedent's estates referred to in § 2055(b) have no connection except via the bookkeeping provisions of requirement (D), § 6503(e),[19] and the fact that the testamentary power of appointment must go to a "spouse." One provides for a "bequest," the other a "transfer" [as the terms are also used in § 2055(a)]. The statute contains no suggestion that the tax assessments on the spouses' estates are to be connected or combined in any way in order to assess the tax consequences for the Miller family. In addition, the case cited by the Tax Court as authority for its crucial statuory construction conclusion applied to the Miller family's attempted use of subsection 2055(b), that a "special" rule used by the family precludes use of a "general" rule, deals with a different type of statutory pattern. Marian Essenfield, 37 T.C. 117, 122–123 (1961), aff'd 311 F.2d 208 (2nd Cir. 1962), is an example of the statutory pattern of a specific versus a general rule,[20] and appears inapposite in this case, where both subsections of 2055(b) are quite specific, apparently dealing with narrow situations outside the "general" tax rule of subsection 2055(a).

We cannot agree with the Tax Court that such draftsmanship shows an intent to have preclusive interplay between 2055(b) (1) and (b) (2) whenever a given husband and wife have the requisite powers of appointment, and to the contrary think that the phrase "for purposes of this section" (referring to § 2055, see 48 T.C. at 270), appearing in both 2055(b) (1) and (b) (2), if anything, indicates a different statutory pattern, namely that (b) (2) is in addition to (b) (1)—an item of special legislation for certain octogenarians. If Congress so clearly had the intent imputed by the Tax Court, they would have used the phrase "for purposes of this subsection" (referring to "powers of appointment") as they did in the last sentence of subsection (a).

Since we find Congressional guidance certainly no greater with respect to Hugh's claimed deduction than Edna's, we think the decision in Hugh's estate should be reversed. The Commissioner's complaint of "triple deduction" should be addressed to Congress, the only body that can adequately resolve the complex questions raised by the Miller family and currently unanswered in the "special legislation" of § 2055(b) (2).

Accordingly, the decision appealed from in No. 17133 (Estate of Edna Allen Miller, 48 T.C. 251) will be affirmed; the decision appealed from in No. 16940 (Estate of Hugh Gordon Miller, 48 T.C. 265) will be reversed, with instructions to enter a decision for the petitioners.

18. The combinations of deductions possible as § 2055(b) (1) and (b) (2) are or are not interrelated may have to vary with the proper solution of § 2055(b)'s consequences under other estate tax sections.

19. 26 U.S.C. § 6503(e) was amended at the same time as § 2055(b) (2) to suspend the running of the statute of limitations on the first dying spouse's estate until 30 days after the filing of the surviving spouse's estate tax return.

20. *Marian Essenfield* dealt with § 22(b) (1) of the 1939 Code. As the Second Circuit observed, 311 F.2d at 209–210, even if they assumed that the contested

payments were "insurance" payments, they fell under two subsections at once, and the rule was that in such instances the more "particular" one would control over the "general." The cases cited by the Commissioner in his brief similarly involve "specific" vs. "general" in resolving problems rather unlike that posed by the present case, e. g., Central Commercial Company v. C. I. R., 337 F.2d 387, 389 (7th Cir. 1964), a problem of mineral definition in a depletion case, and show that the normal context for using this rule is in resolving issues that ultimately turn on definition.