STAMICARBON, N. V., Plaintiff-Appellee,

v.

ESCAMBIA CHEMICAL CORPORATION, Defendant-Appellant.

No. 27596.

United States Court of Appeals, Fifth Circuit.

July 21, 1970.

Mark Hulsey, Jr., Jacksonville, Fla., Pennie, Edmonds, Morton, Taylor & Adams, Stanton T. Lawrence, Jr., Charles J. Brown, New York City, Glickstein Crenshaw, Glickstein, Hulsey & Fay, Jacksonville, Fla., for appellant.

Victor Cawthon, A. Frank O'Kelley, Tallahassee, Fla., Cushman, Darby & Cushman, John W. Malley, Carl G. Love, George M. Sirilla, Donald J. Bird, Washington, D. C., Keen, O'Kelley & Spitz, Tallahassee, Fla., of counsel, for appellee.

Before GEWIN, GODBOLD and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Stamicarbon brought suit for patent infringement and an accounting against Escambia. Escambia defended by attacking the validity of the patent on the bases of obviousness and anticipation. After a lengthy and extensive trial to the court, the district judge found the patent both valid and infringed and reserved decision on the matter of an accounting. Escambia appeals, contending (1) the district court applied an incorrect standard of proof, (2) the court's findings are clearly erroneous, (3) one of its witnesses was improperly impeached, and (4) the appeal should be dismissed because it appealed from an order which is not appealable. Finding no reversable error in the findings and conclusions of the district court, we affirm.

## I. BACKGROUND.[1]

Although the date of the patent in suit is April 15, 1953, the story of this case begins almost twenty years before —in the mid-thirties when a young engineer, Joseph P. M. van Waes, developed a process for manufacturing urea in stainless steel containers which, for all practical purposes, solved the attendant problem of corrosion which had previously plagued the use of such otherwise most desirable equipment. The chief ingredient of the van Waes process was oxygen. When a measured amount of oxygen was introduced in the equipment in which urea was manufactured, it reacted with the stainless steel containers to form a protective film of oxide on the container walls, thus preventing— or very substantially retarding—corrosion. Because of the intervention of World War II and for various other reasons, the van Waes process was not immediately exploited. In fact, it remained unused until about 1948 when Companie Nerlandaise de L'Asote (CNA) sold the

---

1. For the detailed findings of fact and conclusions of law made by the district court, *see* 300 F.Supp. 1209 (N.D.Fla. 1969).

pilot plant developed by van Waes to the Dutch State Mines (DSM), the parent of Stamicarbon. The urea manufacturing plant was reassembled, and van Waes, who was then working for DSM, was called upon for advice and assistance in making the plant operational and in bringing stainless equipment corrosion under practical control. Finally, in 1953 it occurred to someone that van Waes' process might be patentable. Consequently an application for a patent was filed in The Netherlands on April 15, 1953. The United States application was filed April 9, 1954, and the subject Letters Patent No. 2,727,069 were granted van Waes on December 13, 1955. Van Waes subsequently assigned this patent to Stamicarbon.

The significance of the van Waes process is manifest. Urea was first synthesized in the early 1800's. It was originally used for the production of certain plastics. In recent years demand has multiplied as it has become important in the fertilizer industry and as a component in certain animal feed. The raw materials of urea basically are carbon dioxide and ammonia. During the process of synthesizing urea, a highly corrosive substance, ammonium carbamate is necessarily produced. Before the van Waes process was developed, urea had to be manufactured in corrosion-resistant vessels that were lined with either silver or lead, neither of which provided a satisfactory solution to the corrosion problem. Both forms of lined vessels were economically and structurally unsatisfactory. The van Waes process permitted the use of cheaper and lighter stainless steel.

Escambia's plant, which is the cause of this suit, is located in Pace, Florida, and was constructed and designed by Chemical Construction Company. It went into operation in January 1962. Assuming the validity of the patent, there is no serious question but that the Escambia process as originally constructed and used does in fact infringe.[2]

## II. THE ERRONEOUS STANDARD OF PROOF.

The first ground for reversal advanced by Escambia is that the district court applied an erroneous standard of proof in making its findings in the instant case. Here the attack principally centers upon Conclusion 3, which reads:

"The aforesaid patent in suit is entitled to the presumption of validity under 35 U.S.C. § 282, and the proof offered to overcome this presumption of validity must be such as to prove invalidity beyond a reasonable doubt."

Escambia develops two salients in this assault—(1) the conclusion erroneously imposes a standard of proof "beyond a reasonable doubt", and (2) equally wrongly, it requires proof of invalidity —a question of law to which no standard of proof is appropriate.

We consider first the challenged requirement: "to prove invalidity". In Graham v. John Deere Company, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court discussed for the first time the enactment of 35 U.S.C.A. § 103 (1954) which was added to the patent law in 1952. It ruled that Section 103 codifies the requirement of "invention" imposed by the court in a line of cases beginning with Hotchkiss v. Greenwood, 11 How. (52 U.S.) 248, 13 L.Ed. 683 (1851). Section 103 speaks of the concept in terms of "obviousness" rather than "invention". Graham establishes these procedures by which obviousness is determined:

"Under § 103, the scope and content of the prior art are to be determined;

---

2. We are aware that in 1968 Escambia modified its process with the intent to take it out of the area claimed by the Stamicarbon patent. Whether the modified process would still infringe has not been determined, although Stamicarbon admits in its brief that if the new process functions as Escambia claims, there would be no infringement. In any event, that issue is not now before this court. We mention it here only because this opinion is not to be construed as having ruled on this matter.

differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined." 383 U.S. at 17, 86 S. Ct. at 693.

Thus obviousness is a question of law determined against the factual background of the state of the prior art and the claimed improvement on it. *See* Anderson's Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); Johns-Manville Corp. v. Cement Asbestos Products Co., 428 F.2d 1381 (5th Cir. 1970); Swofford v. B & W, Inc., 395 F.2d 362 (5th Cir. 1968), cert. denied 393 U.S. 935, 89 S.Ct. 296, 21 L.Ed.2d 272 (1968), reh. denied 393 U.S. 1060, 89 S.Ct. 677, 21 L.Ed.2d 703 (1969). Technically read, Conclusion 3 quoted above could be said to set down a standard of proof for a question of law, but this semantic sortie will not carry the point for Escambia. In the first place, numerous cases of this and other courts have loosely spoken in terms of "proving" or "disproving" the validity of a patent. *See e. g.* Fairchild v. Poe, 259 F.2d 329 (5th Cir. 1958); Harman v. Scott, 90 F.Supp. 486 (S.D. Ohio 1950), aff'd 195 F.2d 916 (6th Cir. 1952), cert. denied 343 U.S. 965, 72 S.Ct. 1059, 96 L.Ed. 1362 (1952); Grand Union Co. v. Kingston Mfg. Co., 292 F. Supp. 483 (D.N.H.1968); Consolidated Car Heating Co. v. Chrome-Gold Alloys Corp., 109 F.Supp. 652 (N.D.N.Y.1952); Galion Iron Works & Mfg. Co. v. Buffalo-Springfield Roller Co., 108 F.Supp. 811 (S.D.Ohio 1952). There is another answer. In the broad overall context of its opinion the court's wording here is no more than elliptical. Under the more facile and practical construction to which this conclusion is entitled, the words "the facts which establish" should be understood to come between "prove" and "invalidity." Because what is dealt with is such an integrated question of fact-made law anyway, we cannot say it constituted reversible error for the court

to couch its conclusion in terms of proving patent invalidity.

■ The other prong of Escambia's attack on Conclusion 3 takes aim upon the civil suit stranger—proof "beyond a reasonable doubt." In evaluating the validity of this thrust we need to consider two other conclusions which also refer to the standard of proof. Conclusion 23 states:

"Evidence of simultaneous work by others on solutions to the problem similar to that devised by the inventor of the patent in suit must be clear and convincing if offered as evidence of obviousness under 35 U.S.C. § 103."

And Conclusion 29 states:

"The proof and evidence offered established that the patent in suit has been infringed by Defendant, and is insufficient to overcome the presumption of validity of the patent to which it is entitled under 35 U.S.C. § 282. The defenses of 'obviousness,' 'on sale' and lack of invention presented by Defendant are not sustained by the evidence."

Although Conclusion 3 deals with the presumption of validity in general, whereas Conclusion 23 treats with the narrower issue of an anticipation defense, there seems no reason why a different standard should be applied. Cf. Metal Arts Co. v. Fuller Co., 389 F.2d 319 (5th Cir. 1968). We understand the parties to this case to agree that the requisite standard of proof which must be met to overcome the presumption of validity is "clear and convincing evidence."

The courts have not been nearly so unanimous, indeed it may well be said the authorities are in a morass of conflict. We have collected only a few examples from the numerous cases which have dealt with the quantum of proof required to overcome the presumption of validity. But they are sufficient to show that some speak in terms of a preponderance of the evidence, *e. g.* Thomson Industries, Inc. v. Nippon Thompson Co., 298 F.Supp. 466 (E.D.N.Y.1968); Application of Lurelle Guild, 204 F.2d

700, 40 CCPA 996 (1954); some use clear and convincing evidence, *e. g.* Rooted Hair, Inc. v. Ideal Toy Corp., 329 F.2d 761 (2d Cir. 1964); Century Industries, Inc. v. Wiebloldt Stores, Inc., 263 F.2d 934 (7th Cir. 1959), cert. denied 359 U.S. 1010, 79 S.Ct. 1149, 3 L. Ed.2d 1036 (1959); Consolidated Electro-dynamics Corp. v. Midwestern Instruments, Inc., 260 F.2d 811 (10th Cir. 1958); Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 298 F.Supp. 435 (W. D.Mich.1969); and still others state that the standard is beyond reasonable doubt, *e. g.* Fairchild v. Poe, 259 F.2d 329 (5th Cir. 1958); Hunt Tool Co. v. Lawrence, 242 F.2d 347 (5th Cir. 1957); Cameron Iron Works v. Stekoll, 242 F.2d 17 (5th Cir. 1957); McCutchen v. Singer Co., 386 F.2d 82 (5th Cir. 1967); Foster Cathead Co. v. Hasha, 382 F.2d 761 (5th Cir. 1967), cert. denied 390 U. S. 906, 88 S.Ct. 819, 19 L.Ed.2d 872 (1947). Mr. Justice Cardozo recognized this confusion in Radio Corp. of America v. Radio Eng'ring Laboratories, Inc., 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163 (1934) when he said:

"A patent regularly issued, and even more obviously a patent issued after a hearing of all the rival claimants, is presumed to be valid until the presumption has been overcome by convincing evidence of error. The force of that presumption has found varying expression in this and other courts. Sometimes it is said that in a suit for infringement, when the defense is a prior invention, 'the burden of proof to make good this defense' is 'upon the party setting it up,' and 'every reasonable doubt should be resolved against him.' * * * Again it is said that 'the presumption of the validity of the patent is such that the defense of invention by another must be established by the clearest proof— perhaps beyond reasonable doubt.' · * * * The context suggests that in these and like phrases the courts were not defining a standard in terms of scientific accuracy or literal precision, but were offering counsel and sugges-

tion to guide the course of judgment. Through all the verbal variances, however, there runs this common core of thought and truth, that one otherwise an infringer who assails the validity of a patent fair upon its face bears a heavy burden of persuasion, and fails unless his evidence has more than a dubious preponderance. * * *" 293 U.S. at 7, 55 S.Ct. at 930.

Justice Cardozo thus recognized that in patent cases, at least, there is not such a great trichotomy among these three denominations for the standard of proof in this aspect of a patent case as there may be in other fields of the law.

■ The Seventh Circuit was confronted with almost the identical issue in Kraft Foods Co. v. Walther Dairy Products, 234 F.2d 279 (7th Cir. 1956), cert. denied 352 U.S. 926, 77 S.Ct. 223, 1 L.Ed.2d 161 (1956), in which they held that a statement such as that found in Conclusion 3 did not require reversal. Part of the language in *Kraft* is particularly apropos:

"Without a jury as the fact finders, the technical niceties sometimes demanded for instructions are insufficient reasons for annulling a trial judge's ultimate decision. We are unpersuaded that the evidence traced in this record hung in such delicate balance that the concept of proof mentioned by the district judge, even if subjectively held, overwhelmed his evaluation of the facts disclosed by the evidence." 234 F.2d at 283.

After our examination of the record and the findings and conclusions here, we likewise decline to examine this phrase myopically. The evidence in the instant case did not hang in such a fine balance that the ultimate decision was erroneous because of the reasonable doubt standard articulated by the district judge in Conclusion 3. Had this case been tried to a jury and inconsistent standards been embodied in instructions, perhaps a different result would obtain—on that we express no opinion. It is sufficient to say that in the case sub judice we clearly find that the presence of this

phrase in Conclusion 3 is not reversible error.

## III. EVIDENTIARY SUPPORT FOR THE FINDINGS.

■ Since Escambia has failed to persuade us that the court applied an incorrect standard of law in making its findings—a ploy which would have removed those findings from the protection of Rule 52(a) Fed.R.Civ.P.—we must now examine Escambia's second line of battle. In this phase of the engagement, Escambia recognizes that the factual determinations on which the conclusion of patent validity is based are subject—just as any other findings of fact—to the strictures of the clearly erroneous rule. See Metal Arts Co. v. Fuller Co., 389 F.2d 319 (5th Cir. 1968); MICR-Shield Co. v. First Nat'l Bank, 404 F.2d 157 (5th Cir. 1968), cert. denied, 394 U. S. 960, 89 S.Ct. 1308, 22 L.Ed.2d 561 (1968).

This part of the conflict must be reviewed with Escambia's two basic claims of patent invalidity in mind: (1) the invention was on sale in this country more than one year before the date of invention and thus unpatentable for want of novelty, and (2) obviousness. These must be considered together with one efficient counter-consideration—that the patent carries a presumption of validity.

### A. The Presumption of Validity.

■ The district court relied very heavily upon the presumption of validity that attaches to patents under 35 U.S.C. A. § 282 (1954). Of course, if it can be shown that the Patent Office was not shown or did not consider additional pertinent prior art, the presumption of validity is weakened if it does not disappear altogether, e. g. B. F. Goodrich Co. v. Rubber Latex Products, Inc., 400 F.2d 410 (6th Cir. 1968). In the "prior art book" prepared and introduced by Escambia, there are six patents relied upon: five of the six were cited in the van Waes application, and the sixth was admitted by one of Escambia's witnesses to be not pertinent. Rather than de-

stroying the presumption of validity, it would seem that it is reinforced by the presence of these citations. Cf. Johns Manville Corp. v. Cement Asbestos Products Co., supra, and Leach v. Rockwood, 404 F.2d 652 (7th Cir. 1968).

■ A second inquiry must be made, however, concerning prior art not before the Patent Office, and that deals with articles and other types of documentary material which—if brought to his attention—might have changed the Patent Examiner's mind about the state of the prior art. We have examined these references contained in the Appendix in the prior art book introduced by Escambia. Since such evidence is documentary, we have conducted our examination de hors the clearly erroneous rule. See, e. g. Armour & Co. v. Wilson & Co., 274 F.2d 143 (7th Cir. 1960). Upon examining the documents in the prior art book, we are not able to say that the district judge erred as a matter of law in Finding of Fact 22 wherein he stated:

"22. Although it was known in the published literature prior to April of 1953 that oxidizing agents could be employed to control corrosion of stainless steel apparatus used in reducing environments and that certain oxidizing agents had been successfully employed to maintain passivity of the stainless steel apparatus in the synthesis of urea, the use of oxygen as described in the patent in suit cannot be considered obvious in view of the evidence indicating that: (a) Oxygen is a relatively mild oxidizing agent and the synthesis environment is extremely corrosive; (b) the corrosion phenomenon is known to intensify as temperature and pressures are highly elevated; (c) the prior art references teach the removal of oxygen, and characterize its presence as 'harmful' and teach the removal of the 'oxide film' before using stainless steel in urea apparatus—all in documents which teach the use of other relatively expensive oxidizing agents such as cupric oxide."

Finding 22 was principally directed to the defense of obviousness, but the finding made therein of the state of the prior art is equally applicable to support the conclusion that the presumption of validity has not lost its vitality.

In addition, the district court had the advantage—as we do not—of hearing direct testimony which amplified and explained much of the material found in the prior art book. Although we do not base our holding that Finding 22 is correct on this additional testimony, our ruling is certainly reinforced by the presence of such additional evidence.

### B. The "On Sale" Defense.

Escambia urges the simple factual defense that Stamicarbon's process —or rather a very similar process (Inventa-Vulcan)—was on sale in the United States more than one year before the date of the patent in suit. 35 U.S.C.A. § 102(b) (1954). The relevant Findings of Fact are numbers 16 and 23 and are as follows:

"16. The evidence is not persuasive that the inventive subject matter defined by the claims of the van Waes patent in suit was publicly known or used or on sale by others in this country prior to April 15, 1953.

\*     \*     \*     \*     \*     \*

"23. The evidence is not persuasive the Charles Cramer, the Inventa Company, Vulcan-Cincinnati Company (or their predecessors or related companies), or any of them, knew of or were possessed of the inventive subject matter of the claims of the van Waes patent in suit prior to April 15, 1953; it is persuasive that if they, or any one, did have knowledge of such subject matter, it was at all times prior to at least April 15, 1953, maintained as a closely guarded trade secret and as confidential proprietary information undisclosed in any fashion."

These findings while not as specific as they might be are certainly sufficient: they find the ultimate facts—that the process was not known, was not on sale, and was not in public use. The record evidence to support every finding is apparent. Inventa-Vulcan did not actually make a sale of a plant incorporating its process until 1954, and its process was apparently in the experimental stage in 1952 and 1953. There is correspondence in the record indicating that the Inventa-Vulcan process was not functioning in the desired manner in March 1953. Such evidence adequately supports the court's finding. It has long been recognized that:

"If the thing were embryotic or inchoate; if it rested in speculation or experiment; if the process pursued for its development had failed to reach the point of consummation, it cannot avail to defeat a patent founded upon a discovery or invention which was completed; while in the other case there was only progress, however near that progress may have approximated to the end view. The law requires, not conjecture, but certainty."

Coffin v. Ogden, 85 U.S. (18 Wall.) 120, 21 L.Ed. 821 (1874); see also 1 Deller's Walker on Patents, § 68 (2d ed. 1964) and cases cited therein. Since there is abundant evidence that the invention relied upon by Escambia as having been on sale did not work, it necessarily follows that the court did not err in holding that no van Waes type process was on sale. Findings 16 and 23 were not clearly erroneous.

### C. Obviousness.

We turn now to the more complex issues of obviousness. We have already discussed the process prescribed by the Supreme Court in Graham v. John Deere, *supra,* whereby the trial court first makes factual determinations as to the state of the prior art, differences between it and the claim at issue, and the level of ordinary skill prevalent in the pertinent art, and then makes a legal determination of obviousness or non-obviousness based upon these factual determinations. The district court in the instant case followed these procedures.

For the most part the findings relating to these factual issues are not attacked on this appeal, so no useful purpose would be served by reviewing the evidence which supports each of them. Suffice it to say that the basic factual determinations on which the conclusion of non-obviousness is reached are found in Findings 8–12, 16–22 and Conclusion of Law 28. Of these, only findings 16 and 22 are specifically charged with being clearly erroneous. Both of these findings have been quoted and we have previously examined the evidence supporting them and found them to be well founded. There is, therefore, nothing in the record which undercuts the factual determinations upon which the district court decided obviousness.

Escambia has introduced much evidence to support a conclusion of obviousness, and since obviousness is a much broader concept than lack of novelty, the very evidence which fails to support a lack of novelty defense could support an obviousness defense. Therefore, we are constrained to outline and discuss the evidence which Escambia contends would support a conclusion of obviousness.

First, we return to the same articles in the prior art book which we originally examined on the question of novelty. Basically, the processes described in this book teach the use of an oxide of some type while van Waes' patent teaches the use of pure oxygen or air. Even though oxygen was known as a passivator of stainless steel prior to the date of van Waes' invention, it was not known in the particular context of urea manufactured. There is some evidence—though not entirely satisfactory—that oxygen had been used to retard corrosion of stainless steel urea manufacture before 1945 —by others than van Waes—but the bulk of the evidence tend to show that the use of oxygen in this context came as a surprise to those people skilled in the art. When this is joined with the statement in the prior art book that "years of experience in the corrosion field have resulted in the conclusion that practically every corrosion problem should be regarded as a distinct individual," we are left with no real basis for holding that the prior art would compel the conclusion that it was obvious to add oxygen to the manufacture of urea to prevent the corrosion of stainless steel.

Second, Escambia urges evidence of simultaneous solutions of the corrosion problem by others as evidence of obviousness. Most of these so-called simultaneous solutions occurred in other countries. Such evidence would be admissible on the question of obviousness, although it might not be admissible to prove prior art under 35 U.S.C.A. § 102 (1954). The district court found that this evidence was not persuasive on the question of obviousness. There are four instances of simultaneous invention discussed in the briefs. The first has already been alluded to—it is the Inventa-Vulcan process. The evidence on this point came in by the deposition of Theodore O. Wentworth and generally is to the effect that in 1949 a fortuitous discovery was made linking oxygen with corrosion in the urea process. However, as late as 1953 or 1954—as has been shown before—the Inventa-Vulcan process which Wentworth was describing was still being developed and was not perfected. Furthermore, evidence of a fortuitous discovery is not convincing that the solution fortuitously discovered was obvious.

The second "simultaneous invention" comes from Russia. It is a patent which bears the inscription "manifested on May 4, 1954." We do not know and are not told, the meaning of this expression in the Russian patent law, but assuming that it is the date of the issuance of the patent—rather than the date on which the application was filed—it is more than a year after the effective date of the van Waes patent. We do not believe such is evidence that the solution was obvious.

The third is work in England done in the early 1940's. Evidence of this work is based on some articles which deal in very general terms with the reduction or elimination of corrosion in stainless

steel vessels by the addition of oxygen. The use of silver vessels in the process is also discussed in the articles. No mention that the process involved is for the manufacture of urea is made in the articles. It is tied to urea by the depositional testimony of an associate of the now deceased scientist who supposedly developed the process. He contends that it should have been obvious to anyone reading the articles that the process involved urea. The difficulty here is, however, that the writer of the articles was attempting to maintain secrecy at the time of his writing. We assume that he did since we are directed to no evidence showing that anyone picked up his hints at the time of the articles. Although when we have the bright illumination of hindsight, we can see it is obvious that he must have been talking about urea, we cannot say that such would have been obvious to a person possessed of ordinary skill in the art on April 15, 1953.

And finally, the fourth instance of simultaneous invention took place in Japan where, by depositional evidence, it is shown that considerable work was done in 1951 or 1952—or before—dealing with the use of oxygen to prevent corrosion of stainless steel in the synthesis of urea. It appears, however, that this avenue was not pursued to a final solution, and the scientist working in this area switched to a different metal to be used in an oxygen-free atmosphere. It is an understatement to say that there is no indication of obviousness when the general approach is abandoned and another is then pursued.

We have considered Escambia's other contentions relating to the obviousness issue and find them to be without merit.

## IV. IMPROPER IMPEACHMENT.

Escambia next mounts a bifurcated assault against the admission of certain articles and documents which, it claims, were used improperly to impeach its witness, Clark. Clark's testimony was presented by deposition. He was cross-examined on certain documents on which he did not rely in his direct testimony. Later at the trial, after Clark's deposition had been admitted, these documents were offered to show the state of the prior art and to impeach the witness. Other documents, about which he was not examined, were also offered for the same purposes. Escambia objected on the ground that no proper foundation for impeachment had been laid and on the additional ground that Stamicarbon was not entitled to prove the prior art.

The district court ruled that the evidence was not admissible for impeachment of the deponent, but was admissible to prove the prior art. Considering the second basis first, we think that Stamicarbon—as an alleged infringee—was clearly entitled to prove the state of the prior art, and thus the court correctly overruled the objection on that basis. See Watson v. Heil, 192 F.2d 982 (4th Cir. 1951).

On the first basis, the district court ruled that the evidence offered was not admissible for purposes of impeachment. Escambia, however, points out that the district court, in acting on its objection, said "to the extent that such evidence may impeach the witness' testimony by contradicting it, such exhibit will also be considered" and claims that this language discloses that the court was ruling both ways on the issue of impeachment. Not so.

At the prologue of this analysis it is appropriate to note that the theory of impeachment here was contradiction by extrinsic evidence and not prior inconsistent statements of the witness, so the necessity of laying a foundation is obviated. See generally McCormick, Evidence §§ 33, 37 and 47 (1954). We have previously said that "while a party may not attack the credibility of its own witness (e.g. by impeachment), it is free to offer contradictory evidence." McConville v. Florida Towing Corp., 321 F.2d 162 (5th Cir. 1963) at 165. If a party may contradict his own witness, it follows a fortiori that he may likewise contradict the wit-

nesses of his opponent. The trier of fact then has to choose which evidence is most likely true. To the extent the trier of fact rejects one witness's evidence in favor of another, he holds it is successfully "contradicted" and to this extent it is "impeached". It would be the sheerest sophistry for such an exercise in semantics to result in permitting form to conquer substance.

We hold that the district court did not err in admitting the evidence.

## V. APPEALABILITY.

■ Escambia assumes the extraordinary position—for an appellant—that the order from which it appeals is not appealable. This appeal, of course, is based upon 28 U.S.C.A. § 1292(a) (4) (1966), which states in pertinent part that "the courts of appeals shall have jurisdiction of appeals from: * * * Judgments in civil actions for patent infringement which are final except for accounting. * * * " We have previously said of this provision that "as Professor Moore has pointed out, the pertinent provision 'is applicable only (a) where there is an adjudication that a patent has been infringed, (b) an accounting is ordered, and (c) the adjudication of patent infringement is final except for the accounting'." Ronel Corp. v. Anchor Lock of Florida, Inc., 312 F.2d 207 (5th Cir. 1963). The same test of appealability is applicable here.

■ As we understand Escambia's position, it contends the order is not appealable because the district court did not make findings on some of the matters advanced by Escambia. *Ronel* and *Illinois Tool Works, Inc. v. Brunsing,* 378 F.2d 234 (9th Cir. 1967) are cited in support of Escambia's position, but they do not convince us that Escambia's position is sound. In both *Ronel* and *Illinois Tool* counterclaims remained unadjudicated at the time appeal was noticed. In the instant case the district court merely has not made specific findings on every evidentiary contention advanced by Escambia in the course of defending

this infringement action. The situations are distinguishable. When a cross-action for infringement or unfair competition has not been disposed of, it is clearly unreasonable to say that the requirement of finality imposed by § 1292(a) (4) has been met. On the other hand it is no part of the policy of the statute to require that a district court must make findings on every point raised in evidence before its judgment can be the subject of § 1292(a) (4) review. In this class of appeals this court looks to see that the conclusions of law are supported by the findings of fact, and then that the findings of fact are supported by the evidence. It is not properly a part of our inquiry to ascertain if additional findings could be supported or could have been made when those made and found by the trial court adequately and fairly dispose of the material points of fact and law.

■ Escambia additionally points out, however, that the district court did not act explicitly on Stamicarbon's request for an injunction against further infringement. This lack of action coupled with an erroneous finding—based upon a stipulation—could lead to ambiguities that would becloud the precise holding of the court. It is therefore necessary to examine the context within which the erroneous finding is cast and to determine its effect upon the court's failure to act upon the request for an injunction.

The specific holding is No. 6G, which states:

> "The defendant Escambia Chemical Corporation also operates its urea plant so that the reaction of the ammonia and $CO_2$ to form the 'melt' is conducted in the presence of an amount of oxygen which falls within the range of 0.1 to 3% by volume of the carbon dioxide used."

This finding is based upon stipulation and very clearly it should have stated:

> "The defendant Escambia Chemical Corporation also operated at all times prior to the pre-trial conference of

June 22, 1968, its urea plant so that the reaction of the ammonia and $CO_2$ to form the 'melt' is conducted in the presence of an amount of oxygen which falls within the range of 0.1 to 3% by volume of the carbon dioxide used."

The only evidence upon which Finding 6G is based is the stipulation, and we have no hesitation in acting here to amend the Finding to be consonant with the stipulation. The record shows that the stipulation was amended by the parties after it was first filed. The district judge must have based his findings upon an earlier version. We are convinced that this was a mere oversight or, if not, it was clearly in error. Accordingly we hereby amend this finding to read as it should have read.

The effect of Finding 6G as amended by us is to negate any implication of continuing infringement which could be said to be present in the unamended finding. The sum and substance of the findings as amended are that Escambia operated within the limits of Stamicarbon's patent up to July 22, 1968, but there is no finding as to infringement after that date. Of course Stamicarbon had the burden of proof on the infringement issue, so if it introduced no evidence of infringement after June 22, 1968, the district court could find none. It was in the district court's discretion to grant an injunction against continuing infringement, see 35 U.S.C.A. § 283 (1954), and Stamicarbon raises no issue that such discretion was abused by the failure to enjoin. We adopt a pragmatic approach to the denial of the requested injunction. This approach has been previously indicated in such cases as McCoy v. Louisiana State Board of Education, 332 F.2d 915 (5th Cir. 1964); Board of Public Instruction of Duval County v. Braxton, 326 F.2d 616 (5th Cir. 1964); and Kelly v. Greer, 354 F.2d 209 (5th Cir. 1965); *accord* National Mediation Board v. Air Line Pilots Association, International, 116 U.S.App. D.C. 300, 323 F.2d 305 (1963). Through all these cases runs the idea that we must look at what the district court did and measure that against the standard of § 1292 to determine appealability. In the absence of a finding of continuing infringement, we therefore assume that the district court had nothing on which to base the grant of an injunction and, sub silentio, denied it.[3] With this assumption, the only issue not disposed of by the district court would be the issue of an accounting. The district court's order is therefore appealable.

Affirmed as modified and remanded for an accounting.

---

3. This assumption does not decide the issue of infringement vel non after June 22, 1968. We limit this opinion in this respect to holding that the stipulation made in this case controlled the court's finding, 6G, and that as so controlled we should read the record as denying the injunctive relief requested. Consequently, we refrain from expressing any hint of an opinion concerning the application of the doctrine of res judicata on such issue in any subsequent action.