ROBERTS DAIRY COMPANY et al.

v.

The UNITED STATES,

v.

MILTON G. WALDBAUM CO., and Marshall Foods, Inc. (formerly Marshall Produce Co.), et al., Third-Party Defendants.

No. 257–69.

United States Court of Claims.

Jan. 28, 1976.

Richard A. Huettner, New York City, for plaintiff. Francis T. Carr, New York City, atty. of record. Kenyon & Kenyon Reilly Carr & Chapin, New York City, of counsel.

D. C. Bradford, III, Omaha, Neb., atty. of record, for the third parties, Milton G. Waldbaum Co. and Marshall Foods, Inc. (formerly Marshall Produce Co.). Bradford & Bloch, Omaha, Neb., of counsel.

Michael W. Werth, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

Before COWEN, Chief Judge, DAVIS and KASHIWA, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on plaintiffs' exceptions to the recommended decision filed May 29, 1974, by Trial Judge Joseph V. Colaianni, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the recommended decision, as hereinafter set forth *, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiffs are not entitled to recover and their petition is dismissed.

### OPINION OF TRIAL JUDGE

COLAIANNI, *Trial Judge:*

Plaintiffs' original petition sought recovery under 28 U.S.C. § 1498 of reasonable and entire compensation for the unauthorized use and manufacture by or for the United States of certain egg products which were alleged to be covered by United States Letters Patent No. 3,113,872 (hereinafter referred to as '872), entitled "Method of Treating Shelled Eggs," issued December 10, 1963, on an application filed January 26, 1960, by Eynon Jones and Albert R. Johnson, and United States Letters Patent No. 3,093,487 (hereinafter referred to as '487), entitled "Egg Products and Processes for Preparing Same," issued June 11, 1963, on an application filed February 27, 1961, by Eynon Jones, Oliver H. Tracy, and Clarence B. Deffenbaugh.

Plaintiffs also sought recovery under 28 U.S.C. § 1491 of damages for defendant's use or manufacture of plaintiff's inventions during 1960 and 1961 while plaintiffs' patents were still pending in the Patent Office. During the course of pretrial discovery, plaintiffs withdrew that portion of their petition which pertained to the contract counts under 28 U.S.C. § 1491.

The '872 patent is wholly owned by Prep Foods, Inc. The '487 patent is jointly owned by Eynon Jones, Oliver H. Tracy, Roberts Dairy Co., Lewis R. Dun-

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his recommended decision, filed May 29, 1974, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

ham, and Edward Johnson. All of the above owners joined in this lawsuit as plaintiffs.

As a result of notices issued by the court under the provisions of Rule 23(b), now Rule 41, at defendant's request, nine third-party defendants entered an appearance in this suit. These nine parties were: (1) A. J. Pietrus & Sons Co., (2) Harp's Green Valley Farms, Inc., (3) Henningsen Foods, Inc., (4) Marshall Foods, Inc. (formerly Marshall Produce Co.), (5) Mid-Central Egg Products, Inc., (6) Milton G. Waldbaum Co., (7) Monark Egg Products, Inc., (8) Southwestern Egg Producers (hereinafter referred to as SWEP), and (9) Tranin Egg Products Co. Because of plaintiffs' decision not to present evidence of alleged infringement against Henningsen Foods, Inc., and Tranin Egg Products Co., these parties were dismissed from this action without costs or attorneys' fees. Mid-Central Egg Products, Inc., is now a division of Monark Egg Products, Inc., and the defense of the former has been wholly taken over by the latter.

Third-party defendants Marshall Foods, Inc., Milton G. Waldbaum Co., and A. J. Pietrus & Sons Co. were each represented by counsel at trial, and each has filed proposed findings of fact and a brief in support of their positions.

The only issues under consideration relate to patent validity and infringement since, by agreement of the parties, the issue of accounting has been deferred until after liability is established.

## I. *Background*

The subject matter of the present litigation involves egg products which are allegedly produced in accordance with the steps outlined in the hereinafter-stated claims. Although the claims do not indicate what is done to the products after they are treated in accordance with the claimed processes, the specifications of the patents in suit disclose that the products are then dehydrated, packed and sold in commerce as instant egg or powdered egg products. A purchaser has only to add water to the instant egg

or powdered egg material to obtain a product that is similar, both in appearance and taste to freshly shelled eggs.

The principal constituents of an egg are the white and the yolk. Egg white is essentially fat-free and consists of about 88% water, 11½% protein and the remainder, minerals and natural reducing sugar, which, although only about 1% or less, is extremely significant for reasons which will hereinafter be discussed. The yolk contains almost all the fat content of the egg and comprises about 49% water, 33% fat and 16% protein.

The yolk fat, on the other hand, consists of approximately one-third saturated fats and two-thirds unsaturated fats. The unsaturated fats have a lower melting point than the saturated fats and the viscosity (resistance to flow) of the fats vary inversely with temperature. Thus, as the temperature increases, the viscosity decreases and the fats become more free-flowing at higher temperatures.

Eggs may become contaminated with various microbiological organisms which are pathogenic to man. Included among these organisms is salmonella, which is known to have over 1,300 different varieties. Salmonella poisoning, which usually results in an upset digestive system with accompanying intense vomiting and diarrhea, can be fatal to the very young and the very old.

Salmonella, which can be present in the intestines of animals may find its way into an egg through a crack in the shell. Since salmonella can also be present in the intestines of humans, it may get into bulk shelled eggs in a processing plant through a plant worker who is a carrier of the organism. To this day, salmonella continues to be considered a fairly serious health hazard in the United States.

However, salmonella can be destroyed by subjecting an egg to heat, above a base line figure which is generally taken as 140° F., for a predetermined length of time. A time/temperature relationship for destroying salmonella has been worked out. Specifically, an exposure of 15–20 minutes is necessary for a temper-

ature setting of 140° F., a 3½ minute exposure is necessary at a temperature of 150° F., but only a 1 or 2 second exposure is required at a temperature of 160° F.

Water is a necessary ingredient for the multiplication of salmonella. The absence of water, such as when an egg product is converted to a dried powder form, inhibits the growth of salmonella. The absence of water will, however, not result in the destruction of the salmonella; instead, it exists in a dormant state and resumes its growth upon reconstitution by the addition of water. While tests have shown that salmonella also becomes dormant at a temperature below 40° F., it has also been determined that the salmonella is not destroyed by subjecting the egg product to freezing temperatures.

The dried egg products produced during World War II were manufactured without any steps being taken to kill the pathogenic bacteria which might be present. Instead, the eggs, after being broken and mixed, were sent directly to a spray drier without any further processing. The outgoing product left the spray drier at a temperature of approximately 130° F., which was too low a temperature to accomplish pasteurization, and, therefore, any salmonella present in an egg processed in such a manner would remain alive but dormant in the dried egg product that resulted.

The failure to destroy salmonella did not present a problem for ingredient products, i. e., products which were subsequently intended to be incorporated into baked products, since the temperature to which the baked products was raised would greatly exceed the temperature necessary to kill any dormant salmonella. However, in those instances where the product manufactured was not to be subjected to a subsequent baking step, but was instead intended to be reconstituted into its former state by the addition of water, such as would be the case if one wished to prepare a scrambled egg, a potentially serious problem existed. Specifically, if the powdered

egg product was contaminated with dormant salmonella, upon reconstitution the salmonella would be reactivated, and the temperature reached by the scrambled eggs prepared in a skillet or in a steam table used for mass feeding would be too low to kill the reactivated salmonella. Not only would the temperature · to which the scrambled egg was raised be too low to kill the salmonella, it would be in the range that was favorable for its growth. This explains why salmonellosis is often associated with the mass feeding that the Armed Forces must necessarily employ.

Storage of dried eggs which were produced by processes prevalent during World War II also presented problems. The dried eggs would in time change in color from yellow to brown, and develop an extremely bitter flavor that made them inedible. These changes resulted, it was later learned, from a "browning reaction" which was caused by the natural reducing sugar in the egg chemically reacting with a portion of the egg protein. The "browning reaction" was found to continue even though the egg was in the dry state, and stored at ambient temperatures.

To remove the reducing sugar from the powdered egg and thus prevent the "browning reaction" from occurring, desugaring processes were developed. The desugaring methods used microbiological agents such as yeast to consume the natural sugar in the egg white during a fermentation step. In an alternative method, the enzyme utilized by the microbiological agent could be employed directly for this purpose. Unfortunately, both methods, although they solved the "browning reaction," aggravated the problem of salmonella contamination, if it was present in the product, by requiring that the product be held for several hours at temperature levels which were ideal for the rapid growth of salmonella. The desugaring operation, by requiring another step, increased the cost of producing powdered eggs. Also, the desugaring operation increased the cost of producing powdered eggs because of the additional ingredients needed in carrying out the added step.

Although the "browning reaction" experienced by dried eggs produced by older processes was thus susceptible of solution, the problem of destroying the salmonella contamination remainded. As previously discussed, salmonella can be destroyed by the application of a high level of heat over a precalculated length of time. However, it is important to be able to accomplish pasteurization without ill-effects on the egg product. Particularly, 140° F., which is at the lower end of the temperature range for killing salmonella, is very close to the temperature at which the egg white protein, which differs from and is more heat sensitive than egg yolk protein, commences to denature or coagulate (cook).

Denaturation of an egg results in changes in the helical shape of the egg protein molecule, such that the molecules of bound water normally held therein are released. As a result, the egg white protein loses its ability to take on water or rehydrate and thus, when the dry egg is reconstituted with water, the final product will not have the textural appearance of an acceptable product.

In addition to the damage to the product if denaturation is permitted, the egg protein as it coagulates tends to build up on the pasteurizer plates, in those instances where hot plate-type pasteurizing equipment is used, during production and can reduce or stop the flow of the product through the equipment.

## II. The Patents in Suit

The inventions embodied in the patents in suit are directed at overcoming all of the above-discussed problems.

In particular, the '872 patent discloses an invention for treating shelled eggs that enhances their keeping qualities and removes objectionable flavor and odors. The patentees were particularly concerned over the lack of a commercially practicable method that would enable the storage of egg products for a long period of time without spoilage or waste. The patent refers to a number of prior attempts to pasteurize eggs that, for one reason or another, proved to be unsuc-

cessful. Specially, the patentees indicate that processes employing additives, such as hydrogen peroxide combined with a catalase enzyme, have proven to be of limited success in the egg drying field.

Similarly, the patentees explained that processes that employed additives to elevate the coagulating temperature of albumen (approximately 140° F.) to a level where the egg product could be effectively pasteurized (between 140° and 165° F.) had not been successful. Moreover, prior art attempts to improve the keeping properties of shelled eggs, without additives, by a two-step heat treatment process were effective for the killing of only certain types of bacteria.

The inventions involved in this suit were thus directed to an improved additive-free process which would enhance the keeping properties of eggs, eliminate coagulation of the albumen, and prevent denaturation of proteins in the egg product.

The process disclosed in the '872 patent calls for preheating the chilled egg material to a temperature in the range of approximately 90° to 130° F., until the fats therein are free-flowing, reducing the egg material to a state of fine dispersion by a homogenizer or equivalent device, so that the egg material is of a homogeneous character that does not exhibit any tendency toward separation of the fat particles from the egg solids, and then heating the fine dispersion to a pasteurizing temperature within the range of approximately 140° F. to approximately 165° F. The fine dispersion is held at the pasteurizing temperature for a period of time that is sufficient to kill or render substantially impotent all pathogenic organisms and undesirable bacteria.

The claims and specification of the '872 patent are not restricted to a process for treating whole eggs, but are capable of being interpreted to cover processes for products which contain ingredients in addition to whole eggs.

Turning now to the '487 patent, the patentees, in the specification thereof, stress the serious problems of spoilage

and contamination by bacteria which exist in powdered, frozen and refrigerated bulk eggs. The specification also underscores how previous sterilization or pasteurization attempts directed at killing the bacteria have—

\* \* \* met with difficulty because when the eggs were heated to a temperature high enough to kill toxic and harmful bacteria, the eggs would partially coagulate or cook, rendering them unfit for most purposes. On the other hand, chemical sterilizing additives such as hydrogen peroxide, and additives such as sugars and starches, which raise the coagulation temperature, also render the eggs unfit for many purposes.

The patentees emphasize that their patented process overcomes these problems. They attribute the success of their process—

\* \* \* to a novel interrelation and cooperation between the homogenizing and pasteurizing steps permitting the use of higher pasteurizing temperatures with a closer approach to complete sterilization of the product than has been attainable heretofore in an uncooked product.

The necessity of having a three-step process, consisting of initially preheating the ingredients, then homogenizing the blend, and finally pasteurizing the blend at a predetermined time/temperature relationship is explained by the patent to be:

(1) In order to take maximum advantage of the phenomenon of oil envelopment of the egg solids \* \* \* [the albumen and other egg proteins, particularly the chalazae, are allegedly able to withstand a higher temperature in the pasteurization step when they are coated in oil], it is preferred to pre-heat the mixture before the homogenizing step.

(2) In the present process the homogenizing step precedes the final high temperature pasteurizing step. \* \* By homogenizing before the final pasteurizing step, there is no possibility of coagulated chalazae strands getting into the homogenizer to clog its orifices. \* \* \*

\* \* \* The protection of the albumen and other proteins by \* \* \* [oil envelopment] appears to be far more effective when the egg material is reduced to an extremely fine dispersion than when the solids are merely beaten or mixed with oil in the absence of homogenization.

(3) While the natural fats in the yolks themselves are effective, after homogenization, in allowing higher pasteurizing temperatures, it is still not possible to operate metallic surfaces at a sufficiently high temperature to produce a salmonella-free product. In the present processes the added oil augments the effect of the natural yolk fats to permit a sufficiently high plate temperature to produce a salmonella-free product without protein coagulation and without the material sticking to the plates. Conventional plate heaters may thus be used in all heating steps \* \* \*.

As stated in the specification of the patents in suit, the crux of both inventions appears to be the discovery by the patentees that it is possible to pasteurize products containing eggs at temperatures sufficiently high to kill substantially all pathogenic bacteria (over 140° F.) without simultaneously denaturing or coagulating the egg protein. Further, the patentees stress that prior to pasteurization, the ingredients of the product being processed are to be preheated to a temperature which makes the fats free-flowing. The preheated ingredients are then reduced to a state of fine dispersion. An example of the type of apparatus which can be used to create a fine dispersion is a positive displacement pump, such as a homogenizer.

Plaintiffs claim that as a result of the preheating step which makes the fats free-flowing, and the step of creating a fine dispersion, each protein strand becomes coated with a film of fat. Thus, plaintiffs' patents require that the fats be in a free-flowing condition prior to the creation of the fine dispersion. As a

result of preheating and homogenization, the egg protein is covered by a layer of fat. This, in turn, makes it possible to heat the ingredients to a sufficiently high temperature to kill substantially all pathogenic bacteria without denaturing the egg protein. Plaintiffs emphasize that the fat layer surrounding the protein absorbs heat very rapidly so that the protein is thermally protected from the high temperature used to destroy the bacteria.

### III. *Patent Claims Involved in Suit*

Plaintiffs urge that claim 1 of the '872 patent and all five claims of the '487 patent have been infringed by defendant during the 6 years immediately preceding the May 29, 1969, filing date of their petition. Claim 1 of the '872 patent reads:

1. The method of treating a shelled egg product without coagulating the same comprising

pre-heating the egg product to a temperature within the range of approximately 90° F. to 130° F. until the fats therein are free-flowing,

reducing the egg product to a state of fine dispersion,

heating said dispersion to a pasteurizing temperature within the range from approximately 140° F. to 165° F., and

holding the dispersion at said temperature to destroy substantially all pathogenic bacteria contained in the egg product.

The broadest claim in the '487 patent, claim 1, reads:

1. The method of preparing a salmonella-free homogenized and pasteurized egg product without coagulating the same comprising

adding to natural shelled eggs a mixture of oil and milk solids in such amount that the end product has the ratio of total solids to total water plus solids that is the same as the ratio of total solids of a natural egg to total solids and water in a natural egg, the oil being selected from the group comprising animal oil and vegetable oil, the total amount of the oil and milk solids being less than the weight of the natural shelled eggs,

mixing the natural shelled egg and the added material,

pre-heating the mixture to approximately 135° F. to make the natural fats in the natural shelled eggs free flowing,

reducing the mixture to a state of fine dispersion,

heating said dispersion to a pasteurization temperature of within the range of 150° F. to 170° F. by bringing the same into contact with the plates of a heat exchanger, and

holding the dispersion at said temperature to destroy substantially all of the pathogenic bacteria contained in the egg product.

Claim 4 of the '487 patent, the claim that was specifically referred to at trial, is somewhat narrower than claim 1, and reads as follows:

4. The method of preparing a salmonella-free homogenized and pasteurized egg product without coagulating the same, comprising

adding to natural shelled eggs a mixture of oil and milk solids in such amount that the end product is approximately 51.93% whole egg, 31.20% milk solids not fat, 15.27% oil and 1.6% salt, the oil being selected from the group comprising animal oil and vegetable oil, mixing the natural shelled egg and added material,

preheating the mixture to approximately 135° F. to make the natural fats in the natural shelled eggs free flowing,

reducing the mixture to a state of fine dispersion,

heating said dispersion to a pasteurizing temperature of within the range of 150° F. to 170° F. by bringing the same into contact with the plates of a heat exchanger, and

holding the dispersion at said temperature to destroy substantially all of the pathogenic bacteria contained in the egg product.

Finally, claim 5 of the '487 patent, which is the only product claim involved in the suit, reads as follows:

5. The product resulting from the process of claim 1.

## IV. Interpretation of the '872 Patent

■ In *Motion Picture Patents Co. v. Universal Film Mfg. Co.,* 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871 (1917), the Supreme Court stated that "The scope of every patent is limited to the invention described in the claims contained in it, read in the light of the specification." More recently, the Supreme Court reiterated that position in *United States v. Adams,* 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572, 148 USPQ 479, 482 (1966), when it stated: "it is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention." *See also, Tate Engineering, Inc. v. United States,* 477 F.2d 1336, 1340, 201 Ct.Cl. 711, 719 (1973). Thus, a patentee is bound by his specification in interpreting his patent claims even when his specification requires a narrower interpretation of the claims than the patentee desires. *Texsteam Corp. v. Blanchard,* 352 F.2d 983, 147 USPQ 431 (5th Cir. 1965), *cert. denied,* 387 U.S. 936, 87 S.Ct. 2064, 18 L.Ed.2d 1000 (1967).

In the present case, although the pasteurization step of claim 1 of the '872 patent in no way limits the manner in which it is to be carried out, the patent specification indicates that the maximum pasteurizing temperature is not to be achieved by contact of the egg product with hot metallic surfaces. Specifically, the patent, by way of the language found at column 3, lines 33–44, clearly limits the way in which pasteurization is to be carried out, in the following manner:

The present novel pasteurizing process rests upon the discovery that additives are not necessary to raise the coagulating temperature of albumen if the egg material is first reduced to a state of fine dispersion and the maximum pasteurizing temperature is not applied by hot metallic surfaces. When the egg material is reduced to a colloidal or homogenous state, it may be raised to a sufficient temperature for a sufficient time by a vaporous heating medium such as steam to kill or render substantially impotent all pathogenic organisms and undesirable bacteria without impairing the functional properties of any part of the egg material.

Further evidence of the patentees' concern that application of the pasteurization heat by hot metallic plate contact with the egg product would result in an alteration of the natural characteristics of the egg is found at column 9, lines 6–13, whereat is found:

Leaving the homogenizer, the material is then heated to a temperature of approximately 143° F. in the plate heater section 26. The temperature here is held within the narrow range of approximately 140° to 144° F. to avoid any alteration of the natural characteristics of the egg material, or denaturation, by contact with the hot metallic plates, though actual coagulation would not start until a somewhat higher temperature was attained.

As a result of these statements in the specification, and in the interest of determining the true meaning of the claims, it is concluded that claim 1 of the '872 patent must be read as requiring that the maximum pasteurizing temperature not be applied by contacting the egg product with hot metallic surfaces. *See Autogiro Co. of America v. United States,* 384 F.2d 391, 397–98, 181 Ct.Cl. 55, 63–64, 155 USPQ 697, 702–03 (1967), where this court indicated that the specification was to be looked to as the concordance for the claims.

Furthermore, this construction of claim 1 is required to distinguish it, as will be more fully discussed hereinafter, from the prior art and to thus avoid

invalidity. *Calico Scallop Corp. v. Willis Bros., Inc.,* 458 F.2d 390, 173 USPQ 321 (4th Cir. 1972); *Tate Engineering, Inc. v. United States, supra.*

## V. *Interpretation of the '487 Patent*

The Supreme Court has stated that " * * * an invention is construed not only in light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office." *Graham v. John Deere Co.,* 383 U.S. 1, 33, 86 S.Ct. 684, 702, 15 L.Ed.2d 545, 148 USPQ 459, 473 (1966). This direction has been followed by a number of courts, including: *Ellipse Corp. v. Ford Motor Co.,* 452 F.2d 163, 171 USPQ 513 (7th Cir. 1971), *cert. denied,* 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972); *Waldon, Inc. v. Alexander Mfg. Co.,* 423 F.2d 91, 165 USPQ 46 (5th Cir. 1970). Indeed, this court's own pronouncement in *Autogiro Co. of America v. United States, supra,* 384 F.2d at 397, 181 Ct.Cl. at 63, 155 USPQ at 702, stresses that the claims of a patent are necessarily construed in connection with the other parts of the patent instrument, as well as the circumstances surrounding the prosecution of the patent application through the Patent Office.

In the present case, all of the claims of the '487 patent require a preheating of the egg mix to a temperature of approximately 135° F. The specification, at column 7, lines 8–10, indicates that a range of 125° to 140° F. satisfies this requirement, provided that the time interval during which the egg mix is exposed to the high end of the temperature range is not unduly prolonged.

■ However, not all of the originally-filed claims contained this temperature limitation. The examiner rejected the claims that failed to include such a limitation on the grounds that the process would not work for all preheating temperatures since it was critical to the invention that the fats be made free-flowing prior to homogenization by preheating the mix to a temperature sufficient to affect the free-flow of the fats. In particular, the application stated that a temperature range of 125° to 140° F. was required to ensure that the fats become free-flowing. Moreover, since the patent application gave no indication that acceptable results would be obtained if the preheat step was conducted at temperatures below 125° F., the claims were allowed only after the preheating temperature limitation was inserted. Limitations made in claims to gain allowance thereof are of the utmost importance and cannot be ignored in a later suit in favor of a broader claim scope. *Autogiro Co. of America v. United States, supra,* 384 F.2d at 398–99, 181 Ct.Cl. at 65, 155 USPQ at 703–04.

In addition, it should be noted that the '872 patent, which issued after the '487 patent but which was filed earlier, disclosed a preheating temperature range of 90° to 130° F. Of course, Eynon Jones is a named inventor in both the '872 and the '487 patents. Furthermore, the same patent attorney prepared and prosecuted both of the patents in suit through the Patent Office.

By way of explanation, plaintiffs during the trial stressed that because of the difference in formulation between the '487 egg mix patent and the '872 egg patent, a higher preheating temperature was needed to ensure that the fats of the ingredients of the '487 patent became free-flowing.

In view of the importance that both the Supreme Court and this court ascribe to the actions of a patentee during the prosecution of a patent application through the Patent Office, it must be concluded that at the time of filing the '487 patent application, the patentees deliberately selected 135° F. as the temperature for the preheating step in spite of the fact that a lower temperature range was being called for in the '872 patent application. Moreover, while the claims of the '487 patent specifically call for a preheating temperature of 135° F., the patent specification indicates that a temperature range of between 125° and 140° F. was intended to be covered by the claim limitation. It is equally clear that temperatures out-

side that range were not intended to be covered by the 135° F. temperature limitation.

Finally, it should be noted that all of the claims of the '487 patent require that the pasteurization temperature of between 150° and 170° F. be applied by bringing the fine dispersion formed by the homogenization step into contact with the plates of an ordinary milk-type pasteurizer.

## VI. Infringement

In April 1960, Eynon Jones and two officers of Roberts Dairy Co. made their initial contact with the United States through the Quartermaster Food and Container Institute (hereinafter referred to as QMFCI) in Chicago. The QMFCI was at that time responsible for evaluating commercial food products for use in the military and for the development of new products, standards and specifications for military products.

During the years 1960 and 1961, defendant thoroughly tested plaintiffs' products which were made by the processes described in the patents and found them to be superior to the dry egg products then in use. Specifically, the tests showed that plaintiffs' egg products tasted better and had better shelf life than the egg products then in use.

The testing program led to the promulgation of a series of Government specifications which set forth the requirements that all products furnished thereunder had to meet. Because plaintiffs have structured their infringement case around the various specifications promulgated by defendant, it is necessary to review the pertinent parts of the relevant specifications to determine whether infringement is present. A summary of the pertinent parts of each specification and the infringement considerations relevant to each specification will now be made.

(1) *October 18, 1962, Military Specification*

This specification called for the following percentages of ingredients: whole egg solids—51%; milk solids, nonfat—30%; vegetable oil—15%; and salt—1.75%. Also, while the specification required blending of the above ingredients prior to homogenization, no indication was given that the ingredients had to be preheated prior to homogenization.

The pasteurizing step called for by the specification required that the blend be heated to about 150° F. or higher and held for not less than 2 minutes, and then heated to at least 165° F. and held for at least 2 seconds. The specification stated that steam infusion could be used to carry out the required pasteurization, but it did not require that it be used.

■ It is well established that a patent for a method or process is not infringed unless all steps or stages of the claimed process are utilized. *Engelhard Industries, Inc. v. Research Instrumental Corp.*, 324 F.2d 347, 139 USPQ 179 (9th Cir. 1963), *cert. denied*, 377 U.S. 923, 84 S.Ct. 1220, 12 L.Ed.2d 215 (1964). Thus, in order to find infringement in the present case, each and every step of each of the claims of the patents in suit, or an equivalent thereof, must have been practiced by the defendant.

■ Although it is possible that contractors producing egg products for defendant in accordance with the 1962 military specification could infringe plaintiffs' patents, acceptance by the United States of products made under that specification, without more, is insufficient to establish infringement of either patent. For example, this specification does not require preheating of the ingredients to about 135° F. prior to homogenization as is required by the '487 patent. Thus, for plaintiffs to prevail on their charge of infringement of the '487 patent, it is necessary for plaintiffs to prove that the egg product accepted by the United States was produced by a process that included preheating of the ingredients to 135° F.

Similarly, egg products made in accordance with the specification would not infringe plaintiffs' '872 patent unless it can also be demonstrated that the ingredients were preheated to between

90°–130° F. prior to being homogenized. Plaintiffs would also have to prove that the maximum pasteurizing temperature called for by the specification was not applied by hot metallic plates.

(2) *November 9, 1965, Military Specification*

The ingredients called for by this specification were the same as required under the 1962 military specification discussed in subsection (1) above. On the other hand, this military specification did require that the ingredients be mixed at a temperature between 100° and 135° F. prior to homogenization. Following homogenization, a pasteurization step similar in all respects to that called for by the 1962 military specification was required.

■ While products made in accordance with this specification could infringe both of the patents in suit, it does not follow that mere performance of the mandatory steps of the specification proves the defendant or its contractors have infringed either the '487 or the '872 patent.

In order to prove infringement of the '487 patent by performance under this specification, plaintiffs must show that preheating of the ingredients to about 135° F. occurred.

In order to prove infringement of the '872 patent by performance under this specification, plaintiffs must show that the maximum pasteurization temperature was not applied by using hot metallic plates.

(3) *PY–38—May 1968—United States Department of Agriculture Specification*

The ingredients to be used, and the percentages of each of the ingredients required by this specification were: whole egg solids—51%; milk solids, nonfat—30%; vegetable oil—15%; and salt—1.5%. While the specification did require that the ingredients be blended and thoroughly mixed prior to homogenization, there was no requirement that the blending and mixing be done at any specific temperature. The specification also did not require that homogenization be accomplished at any particular temperature. It did, however, state that effective results were obtained by homogenization at a temperature between about 125° and 135° F.

Following completion of the homogenization step, the specification indicated that any one of the following three pasteurizing steps could be used: (1) the two-step 1962 military specification method, *see* subsection (1) above; (2) heating to 152° F. and holding for at least 2.5 minutes; or (3) heating to 150° F. and holding for at least 4.3 minutes.

While products made in accordance with this specification could infringe both patents in suit, it does not follow that a mere performance of the mandatory steps of the specification proves that defendant or its contractors have infringed either the '487 or the '872 patent.

For plaintiffs to prove infringement of the '487 patent by performance under this specification, plaintiffs must also show that the ingredients were preheated to 135° F. prior to being homogenized.

For plaintiffs to prove infringement of the '872 patent by performance under this specification, plaintiffs must also show that the ingredients were preheated to between 90°–130° F. prior to homogenization, and, as well, that the maximum pasteurization temperature was not applied by using hot metallic plates.

(4) *PY–45—March 1969—United States Department of Agriculture Specification*

This specification is exactly the same as PY–38, *see* subsection (3) above, except that the quantity of salt has been reduced to 1% from 1.5%. Accordingly, the proof required for plaintiffs to show infringement of either their '487 or '872 patent is the same as discussed in subsection (3) above.

(5) *PY–49—April 1970—United States Department of Agriculture Specification*

This specification is exactly the same as PY–45 except for the elimination of the statement that effective results were

obtained by homogenizing the blended product at a temperature between about 125°–135° F. Accordingly, the proof required for plaintiffs to show infringement of either their '487 or '872 patent is the same as discussed in subsection (3) above.

(6) *PY–53—December 1970—United States Department of Agriculture Specification*

This specification is exactly the same as PY–49.

### A. Monark/Mid-Central Infringement

Since Mid-Central Egg Products, Inc., and Monark Egg Products, Inc., both produced egg mix for the Government using identical processes, plaintiffs' infringement charges against these companies will be jointly considered. Plaintiffs argue that the products produced by Monark and Mid-Central were made pursuant to United States Department of Agriculture (hereinafter referred to as USDA) specifications PY–38, PY–45, PY–49, and PY–53, and that by following all of the required portions of these four specifications, they have infringed the patents in suit.

The record establishes that the highest preheat temperature to which both Monark and Mid-Central subjected their mixes in performing under the above specifications was about 95° F. Following the preheat step, the mix was homogenized by passing it through a positive displacement pump. Finally, pasteurization was accomplished by heating the mix in excess of 152° F. for a time sufficient to kill substantially all of the pathogenic bacteria present in the mix. Pasteurization was accomplished by the use of an ordinary milk-type pasteurizer. The operation of an ordinary milk-type pasteurizer requires that the ingredients being pasteurized be heated to the desired temperature by contact with hot metallic plates.

■ Therefore, since the process used by Monark and Mid-Central to produce egg mixes in accordance with USDA specifications PY–38, PY–45, PY–49, and PY–53 utilized hot metallic plates to ap-

ply the maximum pasteurization temperature, the claims of the '872 patent are not infringed.

Furthermore, while the above-identified USDA specifications do not require that the ingredients be preheated, the testimony did establish that a preheat temperature of about 95° F. was used. However, since all of the claims of the '487 patent require a preheat temperature in the range of 125°–140° F., infringement of the '487 patent has not been established.

Plaintiffs also urge that Monark's production under the 1965 military specification has resulted in the infringement of both of the patents in suit.

■ The testimony of record indicates that Monark on May 18 and June 30, 1966, was awarded contracts for the production of egg products in accordance with the 1965 military specification. The record also establishes that Monark followed all of the steps and requirements called for in the 1965 military specification in producing an egg product under each of the above-identified contracts. In accordance with the 1965 military specification, Monark preheated the ingredients to a temperature of between 100°–135° F. Homogenization of the preheated ingredients was effected by passing the product through a positive displacement pump. Lastly, pasteurization was accomplished by the steam infusion heating of the blend to about 150° F. or higher for not less than 2 minutes, followed by steam infusion heating to at least 165° F. for at least 2 seconds. Accordingly, the process used by Monark to manufacture an egg product which complied with the 1965 military specification did infringe claim 1 of the '872 patent.

■ However, no infringement of the '487 patent has been shown by Monark's production under the 1965 specification. The claims of the '487 patent require that the mixture be preheated to about 135° F. As explained above, the specification of the '487 patent teaches that a preheat temperature range of between 125°–140° F. satisfies the temperature requirements of the claims. While it is possible that Monark in manufactur-

ing under the 1965 military specification preheated the ingredients to above 125° F., plaintiffs have not shown by a preponderance of the evidence that Monark preheated the ingredients to 125° F. Indeed, from the evidence of record it is just as likely that the preheat temperature did not reach 125° F., but was still within the 100°–135° F. range called for by the specification.

Plaintiffs have the burden of proving, by a preponderance of the evidence, that defendant has infringed their patents, *Stamicarbon, N.V. v. Escambia Chem. Corp.*, 430 F.2d 920, 166 USPQ 362 (5th Cir.), *cert. denied*, 400 U.S. 944, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); *Safe Flight Instrument Corp. v. McDonnell-Douglas Corp.*, 169 USPQ 328 (C.D.Calif. 1971), *aff'd*, 482 F.2d 1086, 178 USPQ 13 (9th Cir. 1973), *cert. denied*, 414 U.S. 1113, 94 S.Ct. 843, 38 L.Ed.2d 740. Plaintiffs have not demonstrated either by the testimony or documents of record that the temperature to which Monark, in performing under the 1965 military specification, preheated the ingredients fell within the claimed range of the '487 patent. Accordingly, plaintiffs have failed to prove infringement of the '487 patent by production under the 1965 military specification.

While Mid-Central was never a licensee under either of the patents in suit, the record indicates that Monark did execute a license agreement with Roberts Dairy granting it a nonexclusive license under a number of different patents, including the two patents in suit. The Monark license agreement was executed on May 24, 1966, and expired on May 24, 1968. Moreover, the record indicates that royalties were paid by Monark to plaintiffs under this license agreement. On May 24, 1968, another license agreement, which had a 5-year term, was entered into by Roberts and Monark. This agreement had substantially the same terms and conditions as the earlier agreement.

It thus appears that all production by Monark after May 24, 1966, was done under license from plaintiffs. It is well established that suit against the United States in the Court of Claims under 28 U.S.C. § 1498 is proper only when the alleged infringement is accomplished by the United States, or a United States contractor without a license to practice the invention. Accordingly, since Monark was licensed under the patents in suit for all production after May 24, 1966, plaintiffs' claim of infringement in the present forum is barred. Plaintiffs-licensors are barred from bringing a suit in this court even if Monark has failed to pay royalties to plaintiffs as required by their agreement. *Yassin v. United States*, 76 F.Supp. 509, 520, 110 Ct.Cl. 211, 229, 76 USPQ 466, 475 (1948); *Timken-Detroit Axle Co. v. Alma Motor Co.*, 144 F.2d 714, 717, 62 USPQ 263, 266 (3d Cir. 1944), *rev'd on other grounds*, 329 U.S. 129, 67 S.Ct. 231, 91 L.Ed. 128, 71 USPQ 254 (1946); *Newport News Shipbuilding & Dry Dock Co. v. Isherwood*, 5 F.2d 924, 934 (4th Cir.), *petition for cert. dismissed*, 269 U.S. 592, 46 S.Ct. 13, 70 L.Ed. 429 (1925).

It has been concluded hereinabove that production by Monark in accordance with the provisions of the May 18, 1966, contract does infringe the '872 patent. However, a review of that contract indicates that the egg product was not to be delivered to defendant until July 1966. This delivery date is, of course, after the execution of the May 24, 1966, license agreement between Monark and plaintiffs. Accordingly, while it is possible that the dehydrated egg mix was produced between the May 18, 1966, contract date and the May 24, 1966, license date, the record does not clearly indicate what the facts are on this point. Indeed, the contract delivery date indicates that, if anything, production occurred after the execution of the patent license agreement. In view of this, it must be concluded that plaintiffs have failed to show that infringement of the claims of the '872 patent took place before the license agreement was executed. Thus, no actionable infringement by Monark has taken place.

## B. *SWEP*

Plaintiffs claim that SWEP has infringed the patents in suit by producing

**1358**

under Government specifications PY–38 and PY–45. The record indicates that the process used by SWEP to produce egg products for the Government under USDA specifications PY–38 and PY–45 began by mixing the required ingredients together at 45°–50° F. The ingredients were then preheated to a temperature in the 120°–130° F. range. The mix was then homogenized by passage through a positive displacement pump. Pasteurization at a temperature of about 151° F. for a time sufficient to kill substantially all of the pathogenic bacteria contained therein followed. The heating during pasteurization was accomplished by bringing the mix into contact with hot metallic plates.

 Since the process used by SWEP to produce under the PY–38 and PY–45 specifications utilized hot metallic plates to apply the maximum pasteurization temperature, the '872 patent was not infringed.

However, since the process used to produce under these specifications did homogenize the 120° to 130° F. preheated mix, and then pasteurize at a temperature of about 150° F., by bringing the mix into contact with the plates of a heat exchanger, the '487 patent was infringed.

### C. *Harps*

Harps is accused of infringing the patents in suit by producing under USDA specifications PY–38, PY–45, PY–49, and PY–53. The record establishes that all of the steps called for by these specifications were followed by Harps in performing its contracts.

After the ingredients were mixed, the Harps' process called for their delivery, by centrifugal pumps, to a holding tank that was kept at a temperature of between 50° and 70° F. From this holding tank, another pump delivered the raw mix to a tubular heater, where the mix was preheated to a maximum of 87.5° F. A positive displacement pump, which acted as a homogenizer, transferred the mix to a pasteurizer. At the pasteurizer,

the mix was heated to a temperature of about 154° F. for a time sufficient to kill substantially all of the pathogenic bacteria contained therein. Pasteurization heating was effected by bringing the mix into contact with hot metallic plates.

 The specification of the '872 patent dictates that the pasteurization step of claim 1 be carried out by means other than bringing the mix into contact with hot metallic plates. Since the evidence shows that the process used to produce in accordance with USDA specifications utilized hot metallic plates to apply the maximum pasteurization temperature, the '872 patent was not infringed.

Moreover, since the Harps' process used to produce under specifications PY–38, PY–45, PY–49, and PY–53 did not preheat the mix to a temperature greater than 87.5° F., the '487 patent, which calls for preheating to a temperature of about 135° F., was not infringed.

### D. *Waldbaum*

Waldbaum is accused of infringing the patents in suit by producing under USDA specifications PY–38, PY–45, PY–49, and PY–53. All of the required portions of each of these specifications were carried out by Waldbaum in producing egg products for the Government.

In producing egg products under all of the above USDA specifications, the highest preheating temperature to which Waldbaum subjected the ingredients was about 102° F. The preheat step was followed by the step of homogenization. Homogenization was accomplished by passing the preheated ingredients through a positive displacement pump or a dispersion pump. After homogenization, the mix was pasteurized. Pasteurization at a temperature of about 154° F. for a time sufficient to kill substantially all pathogenic bacteria present was accomplished by bringing the mix into contact with the hot metallic plates of an ordinary milk-type pasteurizer.

The specification of the '872 patent dictates that the pasteurization step of claim 1 be carried out by means other

than bringing the mix into contact with hot metallic plates. Since the evidence shows that the process used to produce in accordance with specifications PY–38, PY–45, PY–49, and PY–53 utilized hot metallic plates to apply the maximum pasteurization temperature, the '872 patent was not infringed.

Moreover, since the Waldbaum process used to produce under USDA specifications PY–38, PY–45, PY–49, and PY–53 did not preheat the mix to a temperature greater than 102° F., the '487 patent, which calls for preheating to a temperature of about 135° F., was not infringed.

Waldbaum is also charged with infringing the patents in suit by producing egg products for the Government under the 1965 military specification. The record establishes that Waldbaum followed all of the required steps of the 1965 military specification in manufacturing egg products for the United States thereunder. In accordance with that specification, the ingredients were to be preheated to between 100° and 135° F. Thereafter, homogenization was effected by passing the mix through a positive displacement pump. Finally, through the use of a steam infusion method for pasteurization, the mix was heated to about 150° F. or higher for at least 2 minutes, and then heated to about 165° F. for at least 2 seconds.

■ The preheating of the ingredients to between 100° and 135° F., the homogenization of the preheated ingredients, and finally the pasteurization of the mix by steam infusion at the temperature called for by the 1965 military specification, establishes the infringement by Waldbaum of the '872 patent.

However, infringement of the '487 patent has not been established. Particularly, the evidence in the record indicates that Waldbaum on March 22, 1966, May 18, 1966, May 19, 1966, June 30, 1966, and July 28, 1966, was awarded contracts for the production of egg products in accordance with the 1965 military specification. That specification called for the ingredients to be preheated to

between 100° and 135° F. The claims of the '487 patent, on the other hand, called for a preheating of the mixture to approximately 135° F. However, the specification of the '487 patent explains that a range of 125° to 140° F. is permitted for the preheating temperature.

While it is possible that Waldbaum, in carrying out the 1965 specification requirements, preheated the ingredients to above 125° F., the record does not establish the actual preheat temperature achieved. Therefore, it is just as likely that the preheat temperature did not reach 125° F., but was still within the 100°–135° F. range called for by the specification. Since, as hereinbefore discussed, with regard to plaintiffs' charges of infringement by Mid-Central/Monark, the burden of proof is on plaintiffs to demonstrate by a preponderance of the evidence that infringement took place, plaintiffs have failed to prove infringement of the '487 patent by production under the 1965 military specification.

On April 12, 1966, Waldbaum entered into a license agreement with Roberts Dairy whereby Waldbaum obtained a nonexclusive license under the two patents in suit. At the time of the agreement, Roberts had the power and authority to enter into this agreement. This agreement remained in effect until January 12, 1970, when Roberts terminated it. The sum of $2,000 was paid by Waldbaum to plaintiffs as a royalty under the license agreement. The royalty payment was made for the production of an egg product under a process that called for the pasteurization step to be carried out by steam infusion.

■ The record clearly indicates that all infringing production by Waldbaum after April 12, 1966, was done under license from plaintiffs. As has been discussed in connection with plaintiffs' charges of infringement against Monark, a suit against the United States in the Court of Claims under 28 U.S.C. § 1498 is only appropriate when the alleged infringement is accomplished by the United States or a United States contractor who does not have a license to practice

the invention. Therefore, the fact that Waldbaum was licensed under the patents in suit for all production after April 12, 1966, bars any claim for infringement in the present forum. No change in result occurs even if Waldbaum has failed to pay plaintiffs the agreed upon royalties for any period during which the contract remained in force. *See Newport News Shipbuilding & Dry Dock Co. v. Isherwood*, 5 F.2d 924, 934 (4th Cir.), *petition for cert. dismissed*, 269 U.S. 592, 46 S.Ct. 13, 70 L.Ed. 429 (1925).

A review of the Waldbaum contracts that call for production under the 1965 military specification indicates that only the March 22, 1966, contract was entered into before Waldbaum became a licensee of plaintiffs. Of course, if Waldbaum produced the egg product called for by the March 22, 1966, contract before the April 12, 1966, license agreement, plaintiffs' charges of infringement would prevail, but the facts, however, appear to be to the contrary. Specifically, from a review of the March 22, 1966, contract it is noted that delivery was scheduled for July 1966. This delivery date is obviously long after the execution of the April 12, 1966, license agreement.

Accordingly, while it is possible that the dehydrated egg mix called for by the contract was produced between March 22, 1966, and the April 12, 1966, license date, the record does not clearly establish the facts on this point. Indeed, the contract delivery date indicates that, if anything, production occurred after the execution of the patent license. Therefore, plaintiffs have failed to establish by a preponderance of the evidence the existence of any actionable infringement by Waldbaum.

### E. *Marshall*

Plaintiffs claim that Marshall has infringed the patents in suit by producing dehydrated egg mix for defendant under USDA specifications PY–38, PY–45, PY–49, and PY–53. The record indicates that Marshall followed all of the required steps of each of these specifications in producing its egg products.

A first process used by Marshall for the production of egg mix included the step of mixing together eggs, which were at a temperature of about 40° to 50° F., oil, which was at room temperature, and milk, which was at a temperature of about 55° F. The mixed ingredients, whose combined temperature was in the range of 40° to 55° F., were then homogenized. The homogenized blend was then passed to a pasteurizer. The mix was heated by the pasteurizer to a temperature of about 155° F. by contact with hot metallic plates. The mix was held at that temperature for a time which was sufficient to kill substantially all of the mix's pathogenic bacteria.

In instances where larger quantities of egg mix were to be produced, the process was modified so that after the homogenization of the cold ingredients, described above, the blend was delivered by a pump to a preheater where its temperature was raised to between 85° and 90° F. The temperature range of 85° to 90° F. represents the maximum range to which the blend was preheated. After leaving the preheater, the blend was homogenized by a positive displacement pump and then sent to the pasteurizer. In the pasteurizer the blend was heated to about 155° F. by bringing it into contact with hot metallic plates, and kept at that temperature for a time sufficient to kill substantially all of the pathogenic bacteria contained therein.

As discussed hereinabove, the claims of the '872 patent are limited to pasteurizers which do not rely upon contact between the mix and hot metallic plates for the killing of substantially all pathogenic bacteria. On the other hand, the only evidence in the record indicates that Marshall followed the requirements of USDA specifications PY–38, PY–45, PY–49, and PY–53 and used a hot plate-type pasteurizer. It is, accordingly, concluded that plaintiffs have failed to establish any actionable infringement of their '872 patent.

The claims of the '487 patent call for the ingredients to be preheated to a temperature within the range of

approximately 135° F. The evidence establishes that Marshall, in producing dehydrated egg mix under USDA specifications PY–38, PY–45, PY–49, and PY–53, preheated the ingredients to a maximum temperature range of 85° to 90° F. Since the preheat range used in the Marshall process does not reach the 135° F. called for by the preheating step of the '487 patent, actual infringement under USDA specifications PY–38, PY–45, PY–49, and PY–53 has not been established.

■ Marshall is also accused of infringing the patents in suit by the manufacture of dehydrated egg products under the 1965 military specification in fulfilling an August 12, 1966, contract with defendant. The record establishes that on June 12, 1968, plaintiffs and Marshall executed an agreement granting Marshall a nonexclusive license under a number of patents, including the two involved in this action. The agreement was to expire on June 12, 1973. Moreover, by stipulation, plaintiffs have agreed not to seek payment from Marshall for any infringement that occurred prior to June 12, 1968. Accordingly, no liability attaches by virtue of Marshall's production pursuant to the August 12, 1966, contract, or for that matter, with respect to any production under USDA specifications PY–38, PY–45, PY–49, and PY–53, and/or the 1965 military specification.

### F. *Pietrus*

Plaintiffs claim that Pietrus has infringed the patents in suit by producing dehydrated egg mix for defendant under USDA specifications PY–38, PY–45, PY–49, and PY–53. The record indicates that Pietrus performed all of the required steps of these specifications in producing egg mix for defendant.

In the Pietrus process, the ingredients were mixed together and then preheated. Although there was evidence to show that prior to March 8, 1968, these ingredients were preheated to a temperature within the range of 100° to 135° F., there was no evidence to indicate that subsequent to that date the preheating temperature range was higher than 50°–63° F. The preheated mixture, after passing through a dispersion pump that affected homogenization, was sent to a pasteurizer. In the pasteurizer hot metallic plates contacted the mix and heated it to a temperature sufficient to kill substantially all of the pathogenic bacteria contained therein.

The '872 patent claims, as limited by the patent specification, require that pasteurization to kill substantially all pathogenic bacteria be done by an arrangement that does not require contact of the mix with hot metallic plates. However, since the processes used by Pietrus to produce egg mix under USDA specifications PY–38, PY–45, PY–49, and PY–53 all utilized hot metallic plate pasteurizers, no actionable infringement of the '872 patent by production under these specifications has been established by plaintiffs.

■ The record indicates that prior to March 8, 1968, Pietrus, in producing egg mix under specifications PY–38, PY–45, PY–49, and PY–53, did preheat the ingredients to a temperature within the range of 100°–135° F. The evidence falls short of establishing that Pietrus preheated the ingredients to a temperature range of 125° to 140° F., since it is just as likely that the ingredients were only preheated to a temperature within the range of 100°–120° F. Accordingly, since plaintiffs have the burden of proof on infringement, *see Stamicarbon, N.V. v. Escambia Chem. Corp.*, 430 F.2d 920, 166 USPQ 362 (5th Cir.), *cert. denied*, 400 U.S. 944, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); *Safe Flight Instrument Corp. v. McDonnell-Douglas Corp.*, 169 USPQ 328 (C.D.Calif.1971), *aff'd*, 482 F.2d 1086, 178 USPQ 13 (9th Cir. 1973), infringement of the '487 patent has not been established.

After March 8, 1968, Pietrus only preheated to a temperature range of 50°–63° F. Accordingly, no infringement of the '487 patent resulted from production under specifications PY–38, PY–45, PY–49, and PY–53.

Pietrus is also charged with infringement of the patents in suit by producing under the 1962 military specification with regard to contracts let on March 19, 1964, and April 14, 1965, and under the 1965 military specification with regard to four contracts let between March 22, 1966, and June 30, 1966. The testimony at trial established that Pietrus, in producing dehydrated egg mix under the contracts, followed all of the steps required by the appropriate specification.

■ We first turn our attention to plaintiffs' charge of infringement of their '487 and '872 patents by Pietrus' production under the 1962 military specification. Looking to the requirements of the 1962 military specification, it is noted that no preheat temperature is recommended. In the absence of a showing by plaintiffs as to what temperature was used by Pietrus, none can be assumed. Since plaintiffs have the burden of proof on infringement, no infringement of either the '487 or '872 patents, both of which require preheat temperatures of 90° or higher, has been established for production by Pietrus under the 1962 military specification.

We next turn to plaintiffs' charge of infringement for the egg products produced by Pietrus under the 1965 military specification. The testimony indicates that the preheating temperature used for production under the 1965 specification was about 120° F. However, the record also establishes that this preheat temperature was used for only a short period, and, as is explained in more detail in the findings of fact, only after the execution of a license agreement by plaintiffs and Pietrus.

■ The record also establishes that notwithstanding the requirement in the 1965 specification for use of a steam infusion-type pasteurizer, in fact, a hot plate pasteurizer was used. Accordingly, since the claims of the '872 patent, as limited by the patent specification, do not cover hot plate pasteurizers, no infringement of the '872 patent by Pietrus' production of egg products under the 1965 military specification has been established.

However, as mentioned above, the testimony does indicate that a preheat temperature of 120° F. was used in producing under the 1965 military specification. Further, there is no dispute that the mix was homogenized after preheating. Finally, the record also establishes that the Pietrus process used hot plate pasteurization at such a temperature to destroy substantially all pathogenic bacteria. Accordingly, infringement of the '487 patent has been established by Pietrus' production under the 1965 specification.

■ However, any infringement which did occur under the 1965 military specification is excused because of the existence of a license between plaintiffs and Pietrus. The testimony indicates that plaintiffs and Pietrus entered into a license agreement on March 8, 1966. The agreement granted Pietrus a nonexclusive license under a number of patents, including the two patents involved in this action. While it appears that the license was terminated on March 8, 1968, it was in existence during the time of the established infringement by Pietrus. Particularly, the four contracts, which called for production of an egg mix under the 1965 military specification, were entered into between March 22, 1966, and June 30, 1966. All production under these contracts was, accordingly, well within the March 8, 1966, and March 8, 1968, license period. As hereinabove discussed with regard to Mid-Central/Monark infringement as well as the Waldbaum infringement, the Court of Claims is not the proper forum for alleged infringement by the United States when the United States contractor is licensed by the patentee. Therefore, no liability whatsoever attaches to production by Pietrus.

## VII. *Validity*

■ Defendant and the third-party defendants, in addition to their noninfringement defense, also contend that the two patents involved in this action are invalid. In support of their arguments on invalidity, defendant and the

third-party defendants have cited a total of 34 prior art references. Reliance upon a multitude of prior art references in attempting to establish obviousness has often been found to buttress the statutory presumption of validity.[1] *Reynolds v. Whitin Mach. Works*, 167 F.2d 78 (4th Cir. 1948), *cert. denied*, 334 U.S. 844, 68 S.Ct. 1513, 92 L.Ed. 1768. However, as will be discussed in considerable detail hereinbelow, the failure by the Patent Office to consider important prior art references while evaluating the patentability of a pending application has been found to be enough to overcome the statutory presumption of validity of an issued patent. *T. P. Laboratories v. Huge*, 371 F.2d 231, 151 USPQ 605 (7th Cir. 1966).

■ After a careful review of the prior art references, it is concluded that no single reference discloses all of the steps required by the claims of the patents in suit. Therefore, neither the '487 nor the '872 patent are found to be invalid under 35 U.S.C. § 102 (1970).[2]

■ We next turn our attention to defendant's and third-party defendants' contentions that the '487 patent is invalid by reason of the failure of the claims thereof meeting the requirements for patentability set forth in 35 U.S.C. § 103 (1970).[3] While recognizing that the ultimate question of patent validity was one of law, the Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1, 88 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459 (1966), indicated that a factual analysis of the following factors was necessary in resolving the issue of patent validity under 35 U.S.C. § 103:

(1) the scope and content of the prior art;

(2) the difference between the prior art and the claims in issue; and

(3) the level of ordinary skill in the pertinent art.

In addition, secondary considerations, such as commercial success, satisfying a long-felt need, and failure of others are also relevant considerations.

With these guidelines in mind, it is pertinent to focus on the alleged purpose of the '487 invention. Specifically, it is noted that plaintiffs were directing their efforts toward satisfying an alleged need for a method for preparing a salmonella-free homogenized, and pasteurized egg product which retains the taste and appearance of prepared fresh eggs.

The specifications of the patents involved in this action, *see* sections II, IV and V above for a more detailed discussion, particularly emphasize the importance of the interrelation and cooperation between the homogenizing and pasteurizing steps to permit higher pasteurization temperatures. Plaintiffs state that their process permitted the higher pasteurization temperatures without the coagulation of the albumen in egg whites and without the use of additives to raise the coagulation temperature of the albumen. Plaintiffs also urge that the inventions enabled egg whites to withstand higher pasteurizing temperatures without coagulation, by recognizing that a coating of oil over the egg

---

1. 35 U.S.C. § 282 provides in pertinent part:

"A patent shall be presumed valid. * * * The burden of establishing invalidity of a patent shall rest on a party asserting it."

2. 35 U.S.C. § 102 provides in pertinent part:

"A person shall be entitled to a patent unless—

"(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

"(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, * * *."

3. 35 U.S.C. § 103 provides:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

protein separated the egg material from the hot pasteurizing surfaces. Plaintiffs, by way of their patent specifications, stressed that while some prior art processes utilized a homogenization step after pasteurization, in their processes the homogenization step preceded pasteurization. The homogenization step insured that the albumen and other egg proteins would be coated with oil prior to the commencement of the pasteurization step. In the words of the '487 patent:

> The protection of the albumen and other proteins by the oil appears to be far more effective when the egg material is reduced to an extremely fine dispersion than when the solids are merely beaten or mixed with oil in the absence of homogenization.

In explaining the necessity of plaintiffs' preheating step, the patent specification states:

> In order to take maximum advantage of the phenomenon of oil envelopment of the egg solids as hereinabove described, it is preferred to pre-heat the mixture before the homogenizing step. Egg yolks themselves contain a substantial percentage of natural fat which is available to act in the same manner as the added oil if the material is warmed to a degree sufficient to make the natural fats free flowing in the mixture. For this reason it is desirable to interpose the homogenizing step between a pre-heating step and the final pasteurizing step.

At trial, defendant and third-party defendants introduced a number of prior art references, only the following four are considered in this analysis:

(a) United States Letters Patent No. 2,479,310, which issued to Mr. Edward K. Chapin in 1949;

(b) An article by *Heller, et al.*, which appeared in Food Manufacture, Vol. 33, Aug. 1958, pp. 335–37;

(c) Danish article by *Moller Madsen*, which appeared in Sundhedsplejen, Vol. 10, No. 8, Dec. 1958, pp. 102–05; and

(d) Polish article by *Szczepula*, which appeared in Przemysl Spozywczy, Vol. XII, No. 1, March 17, 1958, pp. 21–26.

Except for the Chapin patent, which is cited in the '487 patent, none of the above articles were cited or considered by the Patent Office during the prosecution of the '487 or the '872 patents.

The Chapin patent relates to a process for producing and preserving powdered egg compositions. The Chapin composition is made up of various percentages of whole egg, milk solids and edible fat. Chapin requires that the liquid egg, milk and fat be rapidly added together and thoroughly mixed at a temperature which does not exceed 135° F. The mixture is then subjected to emulsification, to form a more stable oil-in-water emulsion and to finely subdivide the materials, by the use of mechanical means, such as a homogenizer or colloidal mill. Thereafter, the emulsion is spray dried to cause the evaporation of its moisture content and reduce it to a finely divided composite particle condition.

Chapin's powdered composition was not intended to be reconstituted for consumption as an egg product. Instead, Chapin intended and sought to produce a powdered, creamy, yellow, soft product which could be used directly in the preparation of baked products or for preparation of food mixes. Because the product would be subjected to high baking temperatures, pasteurization of the Chapin composition was not contemplated or necessary.

While the prior art Chapin patent does not teach the pasteurization of the powdered egg product, it does teach the first two steps of the claims of the '487 patent, *i. e.*, preheating and homogenization.

The Danish publication, Sundhedsplejen, which was not considered by the Patent Office while either of the two patents involved in this action were pending as applications, describes the pasteurizing of egg products. After referring to the salmonella epidemics which occurred as a result of the increased use of industrially-treated egg

products, the 1958 article stated that virtually all precautions taken to that date to ensure that egg products did not contain salmonella bacteria relied upon one form or another of heat treatment or pasteurization. According to the article, ordinary milk-pasteurizing apparatus has been the most common type of equipment used in the pasteurization of egg products.

The article, however, recognized, due to the variance in chemical composition, that different factors had to be considered in pasteurizing whole eggs, a mixture of egg white and egg yolk in the natural condition, pure egg yolks, or pure egg whites. Quite significantly, the Danish article also recognized that the destruction of salmonella was to be accomplished without at the same time cooking or otherwise affecting the appearance or quality of the final egg product. The article discusses in considerable detail the success achieved in pasteurizing whole eggs, egg yolks, and egg whites at temperatures as high as 68°–71° C. (154°–160° F.) by the use of a plate pasteurizer. Moreover, it significantly points out that whole eggs and egg yolks should be homogenized before pasteurization in order to obtain a product of uniform consistency.

We next consider the 1958 prior art article which appeared in Food Manufacture. This article deals with a process used in Great Britain for the production of pasteurized frozen eggs. The process begins with the feeding of whole eggs, which have been previously filtered and chilled, to a homogenizer. Homogenization thus takes place, contrary to the teachings of plaintiffs' patents, at low temperatures. From the homogenizer, the homogenized egg is passed to a hot plate-type pasteurizer, of the type commonly used for pasteurization of milk, where it is held for a minimum of 2–5 minutes at temperatures of 144.5°–146° F. The article explains that no harmful effects appear to have been experienced by eggs that have been pasteurized at temperatures below 160° F. After pasteurization, the egg product is cooled and transferred to a holding tank.

Finally, the March 17, 1958, Polish article also discusses the pasteurization of raw egg pulp. The article points out that in the years immediately following World War II, Poland utilized a long pasteurization time in its methods for processing raw egg pulp. Additives, such as trisodium citrate, were used to prevent the coagulation (cooking) of egg white during the long pasteurization periods. The use of additives permitted pasteurization at temperatures of 62°–63° C. (143.6°–145° F.) for about 20 minutes. However, there was concern that the process, which lasted about 3 hours and included the time needed to raise the temperature of the raw egg pulp to the pasteurization temperature as well as the time required to cool the product to 10° C. (50° F.), exposed the raw egg pulp to temperatures which were optimum for the development of many microbes and for activation of enzymes. In addition, the use of the trisodium citrate additive created a peculiar aftertaste in the final product.

The article went on to explain that as a result of the above deficiencies, a new short method for pasteurization of raw egg pulp was developed in Poland in 1952. The new process included the steps of:

(1) breaking of eggshells, removal of contents and classification into three grades of acceptable eggs and refuse;

(2) homogenization of the eggs and then passing the eggs to a cool container; and

(3) forcing the egg pulp through a hot plate-type pasteurizer where it is exposed to temperatures of 10° C. (50° F.) to 67°–68° C. (153°–154° F.) and back to 10° C. (50° F.) in 3 to 6 minutes.

It should be noted that the Polish process does not include a step of preheating the eggs prior to homogenization. Nonetheless, the article, in commenting on the effectiveness of the process in killing salmonella, points out that no salmonella bacteria was found after examining 1,000 samples of an egg product that had been manufactured in accordance with the process.

All of the above-discussed prior art references are found to be highly pertinent and helpful in resolving the question of whether or not the inventions covered by the '487 and the '872 patents meet the nonobvious subject matter requirement of 35 U.S.C. § 103. It is noted that the '487 patent and the Chapin patent are concerned with the processing of an egg mix, whereas the '872 patent and the three prior art articles relate to the processing of whole eggs. Nonetheless, for reasons which follow, both of the patents in suit and the four prior art references are all found to pertain to the same art.

In the first place, it is noted that although over 50 percent of the process ingredients can be vegetable oil, milk and salt, the claims of the '487 patent identify the resulting product as an egg product. Moreover, perhaps in recognition of the standard which must be met before an article can be called an egg product, plaintiffs were careful not to permit the percentage of eggs in any of their egg mixes to drop below 50 percent. Lastly, it would have been natural for the plaintiffs to look to the egg art to solve any problems that they may have encountered in practicing their processes, because the most significant problem which they faced was coagulation or cooking of the egg during the pasteurizing step of their processes.

The prior art shows that at the time of the inventions in suit the general concepts of preparing an egg product by a process that included the steps of preheating, homogenization and pasteurization were well known. Particularly, the Chapin patent teaches a preheating step at a temperature not to exceed 135° F., and the creation of a fine dispersion by homogenization. While the step of pasteurization is not taught by Chapin, because his product was intended to be subjected to baking temperatures, he did recognize the beneficial effect to be gained by enveloping the egg solid with oil to prevent coagulation. Specifically, Chapin states:

The added fat serves to preserve the egg component by insulating the deli-cate egg solids from induction of air during the steps of emulsification [homogenization] and subsequent dehydration and also tends to act as a buffer to prevent coagulation of the egg solids when the flash heat of the drying step is evaporating the moisture from the emulsion.

Moreover, pasteurization is taught by each of the three prior art articles discussed hereinabove. Indeed, the articles are quite explicit in teaching that salmonella bacteria in whole eggs can be killed by first homogenizing the whole egg and then heating the raw egg pulp, in hot plate-type pasteurizers, to a temperature of between 140°–160° F. for a few minutes.

It is thus clear that if at the time that the inventions involved in this suit were made, one wanted to make the Chapin product salmonella-free without at the same time coagulating the egg, it would have been within the skill of the art to use the pasteurization step taught by any of the three prior art articles because, as these articles explain, pasteurization to kill salmonella without coagulation is achievable providing that the whole eggs have been previously homogenized.

A review of the prior art is persuasive that plaintiffs, in making the invention defined by claims 1–5 of the '487 patent, did nothing more than combine well-known steps, in an obvious order, to obtain an egg product that one skilled in the art would expect. Therefore, claims 1–5 are invalid for failure to define a patentable invention within the meaning of 35 U.S.C. § 103.

For reasons discussed hereinabove with regard to the '487 patent, the '872 patent would also be found to be invalid under 35 U.S.C. § 103 if claim 1 thereof is broadly construed. However, as explained earlier in this opinion, the specification of the '872 patent requires that the pasteurization step called for by the claims be conducted by means other than hot metallic plate-type pasteurizers. The specification specifically speaks of the use of steam infusion-type

pasteurization. Therefore, in line with this court's longstanding policy of favoring a construction of a patent claim that will render it valid over a construction that would render it invalid, *Tate Engineering, Inc. v. United States*, 477 F.2d 1336, 201 Ct.Cl. 711 (1973), *Dominion Magnesium, Ltd. v. United States*, 320 F.2d 388, 162 Ct.Cl. 240 (1963), the narrow construction hereinbefore explained is required for claim 1 of the '872 patent.

None of the prior art cited by the defendant or the third-party defendants indicates that it would have been obvious to substitute a steam infusion pasteurizer for a hot plate-type pasteurizer. It must, accordingly, be concluded that, as narrowly construed, claim 1 of the '872 patent is not invalid under 35 U.S.C. § 103.

## VIII. *Summary*

In summary, the following conclusions are made with respect to the issues of patent validity and infringement raised in this action:

(1) Production by Monark and Waldbaum of egg products for the United States under the provisions of the 1965 military specification infringes claim 1 of the '872 patent. However, a license from plaintiffs to both Monark and Waldbaum renders the plaintiffs' claim moot;

(2) Aside from (1) above, claim 1 of the '872 patent has not been infringed;

(3) Production by Pietrus of egg products for the United States under the provisions of the 1965 military specification infringes the '487 patent. However, a license between plaintiffs and Pietrus renders the plaintiffs' claim moot;

(4) Production by SWEP of egg products for the United States under USDA specifications PY–38 and PY–45 infringes the '487 patent;

(5) Aside from (3) and (4) above, the '487 patent has not been infringed;

(6) Claims 1–5 of the '487 patent are invalid under 35 U.S.C. § 103; and

(7) Claim 1 of the '872 patent is valid.

It is, therefore, concluded that plaintiffs are not entitled to recover, and that the petition should be dismissed.

## CONCLUSION OF LAW

Upon the findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover and their petition is, therefore, dismissed.